UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| CAROL KOHN, mother and legal guardian of SGT, minor and ESTATE OF SGT, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CASE NO.: 2:21-CV-108 |
| | : | |
| CAMDEN COUNTY SCHOOL DISTRICT, DANIEL BURNS, in his Individual Capacity and GAIL DUGGER, in her Individual Capacity and KATHRYN JACKSON, in her Individual Capacity | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## SECOND AMENDED COMPLAINT

COMES NOW, Plaintiff CAROL KOHN, as mother and legal guardian of SGT and on behalf of the Estate of SGT, in the above captioned action, by and through their undersigned counsel of record, and files this Second Amended Complaint and request for damages and respectfully shows the Court the following:

## JURISDICTION AND VENUE

1.

Plaintiff a resident of Ashburn, Loudoun County, Virginia and submits herself to the jurisdiction and venue of this Court.

2.

Defendant Camden County School District (CCSD) is, and at all times herein mentioned, a public school district of Kingsland, Camden County, Georgia, and may be served through its

Superintendent, Dr. John Tucker, Ed.D., at Central Administrative Office, 311 South East Street, Kingsland, Georgia 31548.

3.

Defendant Daniel Burns is, and at all times herein mentioned, a resident of St. Marys, Camden County, Georgia, who may be served at his last known address, 118 Natchez Court, St. Marys, Georgia 31558

4.

Defendant Gail Dugger is, and at all times herein mentioned, a resident of Woodbine, Camden County, Georgia, who may be served at her last known address, 441 Crooked River Drive, Woodbine, Georgia 31569.

5.

Defendant Kathryn Jackson is, and at all times herein mentioned, a resident of Woodbine, Camden County, Georgia.

6.

Plaintiff believes and alleges that, at all times herein mentioned, each of the individual defendants sued herein was the agent and employee of each of the Defendant Camden County School District and was at all times acting within the purpose and scope of such agency and employment.

7.

This action is based upon:

- the tortious acts and/or omissions committed by Defendants within the confines of Camden County, Georgia;

- violations of the Americans with Disabilities Act 42 U.S.C. § 12132 ("ADA");

- violations of Section 504 of the Rehabilitation Act.; and

- violations of the Equal Educational Opportunities Act.

8.

By virtue of the facts contained herein, this Court has jurisdiction and venue of the parties.

## **INTRODUCTION**

9.

Plaintiff is the mother and legal guardian and surviving heir at law of SGT.

10.

For the times relevant to this Complaint, SGT attended school in Camden County, under the purview and control of the Camden County School District.

11.

In 2019, SGT was a fourteen-year-old Puerto Rican boy with a learning disability, who the CCSD and Defendant Burns had previously determined to be at-risk for self-harm and suicide due to a 2018 suicide threat made at school.

12.

SGT was bullied at school because of his disability.

13.

SGT's mother Carol put CCSD and Defendant Burns on notice of the bullying on October 29, 2019.

14.

Defendant Burns then put Defendant Dugger on notice of the bullying.

15.

CCSD was under a duty to investigate reported incidents of bullying.

16.

Despite that duty, CCSD, Defendant Burns, and Defendant Dugger failed to investigate the report of bullying, and no action was taken by CCSD.

17.

Three weeks after the report of bullying and Defendants' failure to investigate the bullying, on November 19, 2019, SGT hung himself.

18.

In a video left to his mother, SGT listed bullying at school ("being called names at school") as one of the reasons he committed suicide.

19.

In his suicide note, SGT listed bullying as one of the reasons for his state of mind, just prior to committing suicide.

20.

SGT took his life, at least in part, because of CCSD's violations under the ADA and the Rehabilitation Act, negligent acts and omissions on the part of CCSD and its employees, as well as standard of care violations committed by CCSD teachers during the 2018 and 2019 school years.

## FACTUAL ALLEGATIONS

### A. History of SGT's Disability and the First Signs of Bullying

21.

Beginning in 2018, Carol sent SGT to a psychiatrist, who diagnosed SGT with attention deficit hyperactivity disorder ("ADHD").

22.

During that mental health treatment, in January of 2018, SGT stated that, "he gets tricked by other kids" to get in trouble. Elaborating through tears, SGT identified one kid at school who "retaliated" against him.

23.

Later, his stepfather indicated to SGT's mental health professional that he was concerned about bullying at school.

**B.  SGT's Self-Harm Threats and Defendants' Failure to Protect SGT**

24.

On December 4, 2018, SGT first threatened suicide. SGT made the threat during school, to a friend.

25.

SGT's friend reported the suicide threat to a Camden County teacher, who reported the threat to the St. Mary's Middle School (SMMS) guidance office.

26.

The head counselor, Defendant Burns, called SGT to his office.

27.

While SGT was in his office, Defendant Burns asked SGT a series of questions, pursuant to CCSD suicide procedure policies.

28.

Those questions included: (a) "Have you been thinking about how you might kill yourself?" (b) "Have you had these thoughts and had some intention of acting on them?", and (c) "Have you started to work out or worked out the details of how to kill yourself?"

29.

SGT responded in the affirmative to each question, with one exception.

30.

SGT refused to answer whether he had "ever done anything, started to do anything, or prepared to do anything to end [his] life", such as "tried to hang yourself."

31.

Defendant Burns noted SGT's answers to those questions on a Form. [Ex. A]

32.

Defendant Burns determined that SGT's parents needed to be contacted and an immediate plan for emergency treatment be made.

33.

Defendant Burns called SGT's mother and stepfather in for a conference to discuss the threat.

34.

While Defendant Burns informed SGT's mother and stepfather of the suicide threat, he did not provide them with a copy of the Form.

35.

Following the conference with SGT's mother and stepfather, Defendant Burns made no follow up with or about SGT.

36.

Specifically, Defendant Burns never called SGT's mother or stepfather again, he never sought to confirm that SGT received mental health treatment, he never communicated SGT's at-risk nature to SGT's teachers, and he never gave a SGT a pass to come see Student Services.

37.

During the same approximate time period, SGT threatened self-harm to another teacher, Sandra Deloach.

38.

Deloach immediately took SGT to the guidance office to meet with Defendant Burns.

39.

Deloach recited to Defendant Burns the statement from SGT which she interpreted to be a threat of self-harm.

40.

Defendant Burns made no record of this interaction in SGT's school file, he did not contact SGT's parents, and he did not follow up with SGT or SGT's teachers regarding the threat.

41.

At least one of SGT's teachers (Defendant Jackson) would have treated SGT differently and would have been more observant of risk signs had Defendant Burns informed them that SGT was at-risk for self-harm.

42.

The SMMS school resource officer, who was SGT's "Trusted Adult," also testified that he would have treated SGT differently and would have spent more time with SGT.

## C. The Continued Bullying

43.

Throughout the 2018 school year and first semester of 2019, the bullying of SGT continued.

44.

In October 2019, Plaintiff found SGT crying in his room.

45.

SGT confided to Plaintiff that kids in his gym class were constantly throwing balls at him and trying to hit him in the head.

46.

In the hallway, kids kicked the back of his knees, causing him to fall to the floor, and kids called him names, inferring that he was homosexual and that he was dumb because of his ADHD.

47.

One bully encouraged him to "kill yourself", and another constantly harassed SGT regarding his Hispanic accent.

48.

Other bullies made fun of SGT because he was "weird" and "dumb."

49.

On Monday, October 28, 2019, Plaintiff called the school to set a meeting with Defendant Burns, requesting that the school investigate the reported bullying and remove SGT from gym class.

50.

Other than record the report of bullying, CCSD failed to do anything to investigate or react to the bullying SGT was experiencing.

### D.  SGT's Early Exit from English Language Services

51.

English was a second language for SGT.

52.

While in Elementary School, SGT entered English as a Second Language programming (ESOL).

53.

SGT remained in ESOL into Middle School at SMMS.

54.

Eligibility for ESOL is reassessed annually through testing, which is graded on a scale of 0 through 6.

55.

A score of 5 or higher requires that the student is exited from the ESOL program.

56.

A score of 4.3 to 4.9 allows the school to exit the ESOL program under certain, limited circumstances:

- the school convenes an English Language (EL) Reclassification Team,
- and that EL Reclassification Team makes the collective decision that the student is capable of successfully exiting the ESOL program.

57.

In May of 2018, SGT scored a 4.4 on his ESOL testing.

58.

In reading comprehension, SGT scored a 3.1 out of 5.

59.

Despite not convening an EL Reclassification Team and making no formal exit plan, CCSD employee Sandra DeLoach decided to exit SGT from ESOL and transfer him to a "monitored student" classification.

60.

Beginning in the first semester of 2019, as a "monitored student," SGT no longer received ESOL services.

61.

For "monitored students," Deloach was required to review the students' grades, interact with their teachers, and monitor the students in various classroom settings to determine how the student was adjusting to the exit from ESOL services.

62.

Deloach was also required to document this monitoring (via a form) and preserve that documentation.

63.

For SGT, Deloach either failed to complete any documentation regarding CCSD's monitoring of him or the CCSD lost all documentation regarding the monitoring.

**E.  The November 6 Section 504 Conference and Second Report of Bullying**

64.

Following SGT's diagnosis with ADHD, on February 6, 2018, Plaintiff emailed SGT's teachers, and informed them of SGT's learning disability.

65.

While at SMMS, SGT's grades were mixed but included failing grades.

66.

Many of SGT's Progress reports, sent to Plaintiff, included comments such as, "Participation affects performance," "Needs to stay on task," "Needs to control talking," "Does not complete classwork," "Not meeting grade level expectations." [1]

67.

 SGT's teachers and CCSD administrator disciplined SGT throughout his tenure at SMMS at a rate higher than that statistical average of his peers.

68.

Much the discipline resulted from distracted behavior (e.g., talking in class, not paying attention, playing games rather than completing assignments).

69.

Based on his diagnosis, the discipline issues, SGT's 504 forms, and grades, Defendant Burns (the head guidance counsel of SMMS) believes that SGT would have been a good candidate for a 504 plan.

70.

Specifically, Defendant Burns believes a 504 plan would have "benefited" SGT.

71.

Despite knowledge of the ADHD diagnosis, discipline issues, and failing grades, none of the teachers or any other CSSD employees informed Plaintiff of her options under Section 504 of the Rehabilitation Act (504).

---

[1] Except for one Progress Report, CCSD has lost or destroyed all SGT's Progress Reports. Plaintiff saved some, which have been disclosed, but assumes there are others which have been permanently lost.

72.

According to Dr. John Tucker, the superintendent of CCSD, it was his expectation that SMMS students and parents learn about their rights under 504 through the student handbook.

73.

However, 504 and the Rehabilitation Act is not discussed in the SMMS student handbook.

74.

Contrary to Section 504, Defendant Dugger does not believe that ADHD is a disability entitling a student to accommodations.

75.

Only through her own research, Plaintiff learned that she could request a 504 for SGT, which we she did in early November 2019.

76.

Plaintiff's request triggered SGT's evaluation for a 504-plan eligibility, including November 6, 2019 parent-teacher conference

77.

During the November 6, 2019 parent-teacher conference, the Kohns again reported the bullying – this time to Defendant Burns (again), Defendant Jackson, Defendant Dugger, and other teachers.

78.

Again, there is no record that anyone with CCSD did anything to investigate or react to the report of bullying.

79.

According to Defendant Burns, SGT would have been approved for a 504 plan.

80.

However, CCSD never approved SGT for a 504 plan because SGT committed suicide before any further action was taken.

81.

If CCSD had referred SGT to a 504 plan sooner, it would have helped SGT: "[I]t would have helped him feel better about school" and "would have given him more of a chance of success," according to Defendant Burns.

82.

Prior to SGT's suicide, there is no evidence that the CCSD implemented any 504 accommodations for SGT.

**F.   The Federal Impact Aid Form and CCSD's Final Punishments of SGT**

83.

CCSD participates in the Federal Impact Aid Program, which reimburses schools districts for the lost revenue associated with the presence of nontaxable Federal property in their districts.

84.

To obtain the aid money, the applicant school district must survey its students to determine what percentage are children of federal employees.

85.

In the fall of 2019, CCSD sent the Federal Impact Aid Form to its students, expecting that the students' parents would complete it.

86.

Because of the bullying problems at CCSD, Plaintiff refused to complete the Federal Impact Aid Form.

87.

Plaintiff's refusal to complete the Federal Impact Aid Form was brought to the attention of Defendant Dugger.

88.

Knowing that Plaintiff was in a meeting to discuss SGT's 504 plan referral on November 6, 2019, Dugger interrupted the meeting multiple times to demand that Plaintiff complete the Federal Aid Form.

89.

Plaintiff again refused, citing the bullying of her sons as the reason for the refusal.

90.

Plaintiff's refusal incensed Defendant Dugger, going so far as to pull SGT out of class and threatening him with punishment if Plaintiff did not complete the form.

91.

Two days after the parent-teacher conference, on November 8, 2019, Defendant Dugger punished SGT to five (5) days of lunch detention for the alleged offense of standing on a yellow pavement curb.

92.

This punishment was administered without notification to Plaintiff.

93.

That lunch detention started on November 11, 2019 and continued until November 15, 2019 – the Friday before SGT committed suicide.

94.

On Monday, November 18, 2019, SGT's math teacher Defendant Jackson, who was present in the November 6, 2019, parent-teacher conference, falsely accused him of disrupting the substitute teacher from the previous week and getting a paper airplane stuck in the ceiling.

95.

In front of the entire class, Jackson used her cell phone to record a video of the paper airplane and SGT, explaining that she was going to contact SGT's mother about his behavior.

96.

SGT put his head on his desk.

97.

Jackson then threw him out of class, sending him to "Ownership Room."

98.

According to the school resource officer (SRO) Billy Walker, in order to send a student to the Ownership Room, a teacher must document why the student was being sent, the date, and the time.

99.

CCSD subsequently either lost or destroyed all records pertaining to SGT being sent to the Ownership Room.

**C. <u>SGT's Suicide</u>**

100.

That afternoon SGT committed suicide.

101.

SGT went home after school with his younger brother BGT.

102.

SGT was visibly upset to his younger brother; he was concerned about the bullying at school and about the treatment he was receiving from his teachers and school administrators.

103.

After SGT and BGT got home, SGT hung himself from the second-floor balcony of his family home.



104.

BGT, his brother, witnessed the whole thing and tried desperately to stop him. They physically struggled. But SGT was stronger. Terrified, BGT called his mother. They immediately called for emergency medical care and called the next-door neighbor, Leigh Ann Davis, who was a former nurse. The neighbor resuscitated SGT until the first responders arrived, who transported SGT to the local hospital in Camden County and later transported SGT to the trauma hospital in Jacksonville, Florida.

105.

SGT could not be saved.

106.

SGT passed away the next morning.

107.

In a suicide note, SGT named bullying and pressure at school as one of the motivations for losing the desire to live.

108.

SGT specifically noted that kids at school bullied him because he was "weird," they called him "gay," and they called him a "fa***t," despite that he liked girls.

109.

In a suicide video to his mother, SGT also spoke heavily of the bullying.

**D. CCSD'S Unaddressed Cultural of Bullying**

110.

Any cursory review of local news and social media indicates that there are deep cultural problems with bullying in the Camden County School District.

111.

The same week that SGT committed suicide, another CCSD student attempted suicide by overdose at school.

112.

Following SGT's suicide many other CCSD parents took to social media and expressed their concerns regarding the unaddressed culture bullying within the school system:

- "Where are the teachers in between classes"
- "Somebody has to protect these children"
- "My child is bullied, a lot."
- "I had to take my daughter out of that school cuz (sic.) of the bullying and threats that kept happening."

- "I fear for our children and wish the school would step it up."
- "We as parents need to go to a school board meeting or the school and start demanding that something be done about the bullying as it's out of control."
- "When you have a teacher calling an entire class idiots…So upsetting, school doesn't seem to care."

113.

Many parents and students in SGT's class felt that CCSD, its administrators, and its teachers ignored this obvious culture of bullying, which was and is pervasive through the school system.

114.

Despite this obvious culture of bullying, the CCSD and individual Defendants have not addressed the problem and have attempted no institutional solutions – before or after SGT's death.

**CAUSES OF ACTIONS**

A. **ADA Violations Against CCSD and All the Individual Defendants**

115.

Plaintiff re-alleges each and every aforementioned paragraph as if fully restated herein.

116.

A five-part test is employed to determine whether a school has liability for bullying under the ADA:  (1) the plaintiff is an individual with a disability or a member of a protected class, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment.

117.

An application of these five elements demonstrates that the CCSD will ultimately be found liable for SGT's suicide.

118.

SGT suffered from a disability in the form of ADHD.

119.

SGT was harassed based on that disability, both by teachers and other students.

120.

The harassment and bullying were severe and pervasive.

121.

Plaintiff complained to multiple officials at CCSD including Individual Defendants, putting them on notice of the bullying SGT endured.

122.

To Defendant Burns, Plaintiff reported bullying twice: first on October 29, 2019, and second November 6, 2019.

123.

CCSD and Individual Defendants were deliberately indifferent to the bullying to SGT, as they completely failed to investigate the report of bullying.

124.

 CCSD and Defendant Burns was also deliberately indifferent to the bullying of SGT, as they were aware he had suicidal tendencies was at-risk for self-harm.

125.

CCSD failed to follow its own protocols regarding bullying and failed to comply with the Americans with Disabilities Act.

126.

Defendant Dugger's conduct was intentional, malicious and done for the purpose of causing SGT to suffer humiliation, mental anguish and emotional and physical distress because Plaintiff angered her over the refusal to complete the Federal Impact Form.

127.

 If the teachers and administrators of the Camden County School District had followed their own policies and the requirements of ADA, and had simply been attentive to a struggling student, SGT could have been saved.

## B. Rehabilitation Act Violations Against All Defendants

128.

Plaintiff re-alleges each and every aforementioned paragraph as if fully restated herein.

129.

The Rehabilitation Act of 1973 requires that CCSD evaluate students with learning disabilities, which impact an area of the student's life, for a Section 504 Plan.

130.

SGT suffered from ADHD, which is considered a learning disability under the Rehabilitation Act.

131.

CCSD was aware of SGT's learning disability as early as January 2018.

132.

CCSD was also aware that SGT had failing grades in some classes, that he often had difficult concentrating in his classes, and that his teachers frequently disciplined SGT for behaviors which could be attributed to his disability.

133.

Based on the foregoing, SGT's ADHD impacted his ability to learn, which was evident to SGT's teachers.

134.

Indeed, Defendant Burns testified that a 504 plan would have benefitted SGT, and Defendant Burns stated that SGT would have been approved for a 504 plan.

135.

Despite knowing of the diagnosed disability and trouble in his classes, no one associated with CCSD ever recommended a Section 504 Rehabilitation Act plan for SGT.

136.

Nor did anyone associated with CCSD mention to Plaintiff that Section 504 plan was a possibility for SGT.

137.

Dr. John Tucker, superintendent of the CCSD, testified that the CCSD's method of educating SMMS students and parents about their 504 rights is in the student handbook. However, upon review of the handbook, it never mentions 504 rights.

138.

SGT committed suicide, in part, because CCSD failed to refer SGT to a 504 Plan and failed to inform SGT's parents of the possibility of a 504 Plan.

**C.  <u>Title VI and Equal Educational Opportunities Act Claim Against CCSD</u>**

139.

Plaintiff re-alleges each and every aforementioned paragraph as if fully restated herein.

140.

The Equal Educational Opportunities Act (EEOA) prohibits a state or state agency from denying equal educational opportunities based on their national origin.

141.

A school district violates the EEOA when (1) the plaintiff faces language barriers that impede his or her equal participation in the school district's instructional programs, (2) the district fails to take appropriate action to overcome those barriers, and (3) the plaintiff was denied equal educational opportunity on account of his national origin.

142.

On its website, the Department of Justice list the following examples as potential violations of the EEOA:

- Fails to provide a language acquisition program to its ELL students or fails to provide adequate language services to its ELL students;

- fails to provide resources to implement its language acquisition program effectively (e.g., an ESL program lacks ESL teachers or ESL materials); and

- exits ELL students before the students acquire English proficiency from ELL services.

143.

An application of these three elements demonstrates that the CCSD's violated the EEOA in regard to SGT's education, which contributed to SGT's suicide.

144.

SGT was of Puerto-Rican, Hispanic descent, and his primary language was Spanish.

145.

At his first school, in the Glynn County School District, SGT received English to Speakers of Other Languages (ESOL) services.

146.

After SGT transferred to SMMS and CCSD, SGT continued to receive ESOL services.

147.

To exit from ESOL services, students are required to take ACCESS testing, which is graded on a 1 to 5 scale.

148.

An ACCESS test grade of 5 requires that the student be exited from formal ESOL services.

149.

According to Defendant Burns (the SMMS head guidance counselor), any test score below 4.5 means the student should continue ESOL services.

150.

Alternatively, Sandra Deloach (the SMMS ESOL teacher) testified that the school can exit a student with a test score of 4.3.[2]

151.

However, according to Deloach, if an ESOL student is exited from ESOL services with an ACCESS test score of 4.3 to 4.9, that student then becomes a "monitored student."

---

[2] Despite completing fact discovery, CCSD has not provided records of any internal or external policy or procedure which was in effect and governing this process during SGT's tenure at SMMS. Thus, Plaintiff cannot determine whether Burns or Deloach is correct in their assertion about when a student should be taken out of ESOL.

152.

After an ESOL student becomes a "monitored student," the school is required to monitor that student to determine if the student needs extra assistance and whether the student can continue to be successful.

153.

Part of that monitoring process is the completion of forms throughout the school year.

154.

In the Spring of 2018, SGT scored a 4.4 on his ACCESS testing, but he scored a 3.1 on the reading comprehension aspect of the testing.

155.

Based on this testing, SMMS made the decision to exit SGT from ESOL services, and SGT became a monitored student starting in the fall of 2018.

156.

CCSD has not produced any records demonstrated that SGT was actually monitored during the 2018-2019 school year.

157.

In the fall of 2019, SGT remained "monitored student."

158.

During the fall 2019 semester, SGT struggled academically, particularly in math and language arts. His grades ranged from Cs to Fs.

159.

SGT's language arts teacher commented on his progress reports, "Encourage reading at home," and "Not meeting grade level expectations."

160.

There is no documentary evidence that CCSD took any measure to determine whether SGT was prematurely exited from ESOL services.

161.

CCSD prematurely exited SGT from ESOL services, when his ACCESS testing showed an English language reading comprehension of only 3.1. This constituted a failure of CCSD to assist SGT in overcoming his language barriers, and it therefore denied SGT an equal educational opportunity.

162.

Then, CCSD, in fact, failed to monitor SGT for his ability to succeed in English language classes, failing to take appropriate action to overcome SGT's language barriers, therefore denied him an equal educational opportunity, in violation of the EEOA.

163.

 If the teachers and administrators of the Camden County School District had provided equal educational opportunities to SGT, they would have removed a significant stressor in the causal chain of events leading to SGT suicide and could have prevented the suicide.

**D.  <u>Negligence Against Dugger</u>**

164.

Plaintiff re-alleges each and every aforementioned paragraph as if fully restated herein.

165.

Defendant Burns notified Defendant Dugger that Plaintiff reported that SGT was being bullied in late October or early November of 2019.

166.

Plaintiff reported the bullying to Defendant Dugger personally on November 6, 2019.

167.

After receiving that report of bullying, Defendant Dugger had a ministerial duty to investigate the bullying and take corrective action if she discovered bullying.

168.

Defendant Dugger failed to investigate the report of bullying and no corrective action was taken to stop the bullying, which was a breach of her ministerial duty.

169.

Defendant Dugger failed to investigate the reports that SGT was being bullied at school.

170.

In fact, Defendant Dugger was not even aware that it was her responsibility to investigate reports of bullying.

171.

Defendant Dugger's failure to investigate and stop the bullying which SGT was experiencing, in part, caused SGT to commit suicide.

### E.  Negligence Against Burns

172.

Plaintiff re-alleges each and every aforementioned paragraph as if fully restated herein.

173.

In December of 2018, SGT threatened to commit suicide to Defendant Burns, including that SGT had formulated a plan to commit suicide.

174.

SGT was thereafter considered a highly at-risk student for self-harm.

175.

As head guidance counselor of SMMS, Defendant Burns had the following ministerial duties relating to students considered highly at-risk for self-harm:

- Give the at-risk student a pass to come to Student Services;

- Communicate with the at-risk student's teachers regarding the need for the student to be allowed to see Student Services;

- Communicate with the at-risk student's teachers regarding the need for them to observant for additional warning signs of self-harm; and

- Follow up with the at-risk student and his or her parents regarding the student's mental health.

176.

Following SGT's suicide threat, Defendant Burns breached his ministerial duties in the following ways:

- Defendant Burns failed to give SGT a pass to come to Student Services;

- He failed to communicate with SGT's teachers regarding the need for SGT to visit Student Services;

- He failed to communicate with SGT's teachers regarding the need for them to observant for additional warning signs of self-harm; and

- He failed to follow up with SGT or his parents regarding the progression of his mental health treatment.

### 177.

Defendant Burn's breaches of his various ministerial duties, in part, caused SGT to commit suicide.

### F.  **Negligence Against Jackson**

### 178.

Plaintiff re-alleges each and every aforementioned paragraph as if fully restated herein.

### 179.

Defendant Jackson had a ministerial duty fairly, proportionally, and objectively apply discipline her students.

### 180.

Defendant Jackson also had a ministerial duty to not administer discipline in way that was designed to humiliate and degrade her students.

### 181.

On November 18, 2019, Defendant Jackson violated those duties to SGT in the following ways:

- Using her cell phone, in front of the entire math class, Defendant Jackson recorded and took pictures of a paper airplane stuck in the ceiling, loudly stating to SGT that she would be sending these pictures to Plaintiff and that SGT would be getting in trouble at home.

- Defendant Jackson made this public display and humiliation of SGT without having any proof that SGT was even responsible for the paper airplane which was stuck in the ceiling and despite that SGT denied he was responsible for it.

- Following Defendant Jackson's public humiliation of SGT, SGT laid his head on his desk, to which Defendant Jackson threw him out of class and sent him to the Ownership Room, further isolating SGT.

182.

Defendant Jackson's breaches of her various ministerial duties, in part, caused SGT to commit suicide.

**SPOLIATION**

183.

Within two to three days of SGT's death, CCSD superintendent Dr. John Tucker was aware that Plaintiff would likely be bringing a lawsuit against CCSD related to SGT's suicide.

184.

 Despite being on notice that Plaintiff would likely be suing CCSD, CCSD failed to take any measures to preserve evidence relating to SGT.

185.

Specifically, CCSD failed to preserve the following:

- SGT's school emails which were hosted on CCSD's Google cloud account.

- Defendant Burns' school emails regarding SGT's suicide threat and Plaintiff's report of bullying.

- Defendant Jackson's school emails regarding SGT.

- Defendant Dugger's school emails regarding SGT.

- Defendant Dugger's call log, demonstrated each phone call she made on a particular day.

- Emails of SGT's other teachers and school administrators.

- SGT's academic progress reports.

- SGT's ESOL monitoring forms.

- Documentation regarding SGT being sent to the Ownership Room.

186.

Any exercise in imagination demonstrates that the significance of the aforementioned evidence cannot be overstated. This evidence could have been the very key to Plaintiff's entire theory of liability.

187.

The aforementioned evidence has been permanently deleted and is not available through third parties.

188.

Plaintiff has therefore been severely prejudiced by CCSD's failure to preserve this evidence.

189.

Because it allowed such critical evidence to be deleted, there is an inference that CCSD acted in bad faith.

190.

Based on the foregoing, Plaintiff should be entitled to spoliation sanctions against CCSD, to be determined at an appropriated hearing before the Court.

## DAMAGES

### A. Special Damages

#### 191.

Plaintiff immediately called for emergency medical assistance upon the discovery of SGT's suicide attempt.

#### 192.

Plaintiff suffered great expense in attempting to save SGT's life, but medical professionals were not able to save him.

#### 193.

As a result of Defendants negligence and violations of the ADA, SGT's Estate incurred medical expenses totaling one hundred and forty-five thousand nine hundred and eighty-five dollars and eighteen cents ($145,985.18).

#### 194.

As a result of Defendants negligence and violations of the ADA, SGT's Estate incurred funeral expenses of five thousand five hundred and eighty dollars and ninety cents ($5,580.90).

### B. Lost Wages

#### 195.

SGT was fourteen years old when he died.

#### 196.

According to the Actuarial Life Table provided by the Social Security Administration, SGT should have lived sixty-three (63) more years.

197.

As a result of Defendants' negligence, violations of the ADA, violations of the Civil Rights Act, and violations of the Rehabilitation Act, Defendants are liable to Plaintiff for sixty-three (63) years of lost wages, in an amount to be proven at trial.

### C.  Pain and Suffering

198.

SGT lived for approximately eighteen (18) hours following the suicide attempt.

199.

During the suicide attempt and the following eighteen (18) hours SGT endured severe pain and suffering as a result of Defendants negligence and violations of federal law.

### D. Lost Intangibles

200.

Plaintiff is entitled to recover the full value of SGT's life, including the lost intangibles whose value cannot be precisely quantified, such as a parent's society, advice, example and counsel, in amount to be proven at trial by the enlightened conscience of a jury.

WHEREFORE, Plaintiff prays:

a)      For general damages, including pain and suffering;

b)      For all special damages, including medical and incidental expenses, funeral expenses, and other consequential damages according to proof;

c)      For lost wages;

d)      For lost intangibles;

e)      For costs of suit herein incurred;

f)      For such other and further relief as the court may deem proper;

g)       That Plaintiff have a trial by jury as to all issues so triable.

The 25th day of March, 2023.


                                                      /s/ *M. Waite Thomas*
                                             Joseph R. Odachowski, Esq.
                                             Georgia State Bar No. 549470
                                             M. Waite Thomas, Esq.
                                             Georgia State Bar No. 617667
                                             Attorneys for Plaintiffs


TAYLOR ODACHOWSKI SCHMIDT
         & CROSSLAND, LLC
300 Oak Street, Suite 200
St. Simons Island, Georgia 31522
Telephone:       (912) 634-0955
Facsimile:       (912) 638-9739
jodachowski@tosclaw.com
wthomas@tosclaw.com