**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | |
|---|---|
| CAROL KOHN, mother and legal guardian of Sebastian Gonzalez Torres; and ESTATE OF SEBASTIAN GONZALEZ TORRES, | |
| Plaintiffs, | CIVIL ACTION NO.: 2:21-cv-108 |
| v. | |
| CAMDEN COUNTY SCHOOL DISTRICT, et al., | |
| Defendants. | |

**O R D E R**

Plaintiffs filed a Motion for Sanctions.  Doc. 50.  Plaintiffs' Motion alleges Defendants failed to take adequate steps to preserve several categories of tangible evidence and electronically stored information, and as a result, the Court should impose sanctions on Defendants.  Defendants responded in opposition, and Plaintiffs replied.  Docs. 63, 64.

For the following reasons, I **GRANT in part** and **DENY in part** Plaintiffs' Motion.  I grant the portions of Plaintiffs' Motion concerning spoliation of SGT's ESOL records and Defendant Dugger's call logbook.  For these portions of the Motion, I conclude Plaintiffs are entitled to sanctions, however they do not rise to the level of drawing an adverse inference.  Therefore, Plaintiffs are **ORDERED** to submit supplemental briefing within 21 days of this Order on the nature of the sanctions requested.

I deny the remaining portions of Plaintiffs' Motion.  However, as explained below, Plaintiffs are permitted to renew their requests for sanctions at a later time on certain categories of evidence if the record supports renewed requests.

**BACKGROUND**

Plaintiffs filed their original Complaint on November 17, 2021, an Amended Complaint on December 12, 2021, and a Second Amended Complaint on May 11, 2023.  Docs. 1, 14, 54-1. Plaintiffs assert various claims arising from the tragic death of SGT, a minor and former student at St. Marys Middle School in the Camden County School District ("CCSD").  Plaintiffs allege SGT died of suicide because of multiple bullying incidents at the school and Defendants' failures to adequately respond to and address those incidents.  Plaintiffs assert claims under the Americans with Disabilities Act ("ADA") and Georgia law.

The following facts are relevant to this order.  At the time of SGT's suicide, Dr. John Tucker was a CCSD high school principal, but had been selected to become the next CCSD superintendent.  Doc. 46-8 at 45.  Dr. Tucker was in a transition period between those two roles. Dr. John Tucker visited Plaintiff Kohn two or three days after SGT's suicide in November 2019. Id. at 46.  Based on the conversation at that meeting, Dr. Tucker recognized Plaintiff Kohn was upset and angry, and Dr. Tucker determined Plaintiffs would be filing a claim or lawsuit against CCSD.  Id.  Dr. Tucker officially assumed the role of superintendent on January 1, 2020.  Id. at 45.

Defendants received an open records request from Plaintiffs' counsel in the summer after the school year ended, in approximately June 2020.  Doc. 50-1 at 105–107.  Plaintiffs sent a demand letter to the Camden County School District on September 8, 2020.  Doc. 63-1. Plaintiffs filed this suit on November 17, 2021.

Although the precise details are unclear, it appears that various types of information related to SGT may have been lost or destroyed in the time between when Dr. Tucker assumed the role of superintendent on January 1, 2020, and when Defendants received Plaintiffs'

counsel's letter in June 2020.  It also appears Defendants took no steps to preserve any evidence in anticipation of litigation prior to June 2020.

## THE PARTIES' ARGUMENTS

Plaintiffs filed the instant Motion for Sanctions, asking the Court to impose sanctions on Defendants for spoliating various items.  Doc. 50.  Plaintiffs argue Defendants (specifically, CCSD) had a duty to preserve evidence related to Plaintiffs' claims once Dr. Tucker had his meeting with Plaintiff Kohn, just a few days after SGT's death, in November 2019.  Plaintiffs allege Defendants failed to preserve 10 categories of documents and evidence: (1) SGT's electronic records; (2) guidance counselor Defendant Burns's separately saved emails; (3) SGT's math teacher Defendant Jackson's separately saved emails; (4) emails from other District employees; (5) SGT's English to Speakers of Other Languages ("ESOL") records; (6) vice principal Defendant Dugger's call logbook; (7) administrative meeting agendas that discussed bullying at St. Marys Middle School; (8) SGT's academic progress reports and other PowerSchool records;[1] (9) documentation regarding SGT being sent to the "Ownership Room";[2] and (10) surveillance footage of the physical education class where SGT was bullied in October 2019.  Id. at 3.

Defendants first argue they did not have a duty to preserve evidence because Defendant CCSD did not reasonably anticipate litigation until June 2020, at the earliest, and by then most of the items identified in Plaintiffs' Motion had already been destroyed or deleted based on standard practices.  Doc. 63 at 3.  Defendants also argue that even if Defendants did reasonably anticipate litigation prior to June 2020, Plaintiffs have not shown any evidence of bad faith in Defendants'

---

[1]     PowerSchool is a software program used to hold students' personal information, guidance counselor log entries, grades, and student progress reports, among other things.  Doc. 50 at 3 n.1.

[2]     The Ownership Room is similar to an in-school suspension or a cooling off room.  Doc. 50 at 3.

failure to preserve any of the 10 identified categories.  Defendants further argue Plaintiffs have not shown that five of the categories of evidence even existed at the time Defendants reasonably anticipated litigation: SGT's electronic records, other district employee emails, SGT's academic progress reports, Ownership Room records, and surveillance footage of SGT's bullying.

**DISCUSSION**

Plaintiffs allege Defendants spoliated both tangible evidence and ESI.  Defendants contend they did not have a duty to preserve evidence until after the evidence was already lost or destroyed.  Defendants also argue that even if they had a duty to preserve, Plaintiffs have not shown all the categories of evidence existed, and Plaintiffs have not shown sanctions should be imposed.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Zietz v. Innzbruck Golf Resort, Inc., No. 2:15-cv-218, 2016 WL 6193475, at *2 (N.D. Ga. Oct. 24, 2016).  The standard for determining if sanctions should be imposed for spoliating evidence depends on whether the evidence was tangible evidence or electronically stored evidence ("ESI").  Polk v. Gen. Motors, LLC, No. 3:20-CV-549, 2024 WL 326624, at *17 (M.D. Fla. Jan. 29, 2024).  Although the legal standards differ, sanctions can only be imposed if the nonmoving party had a duty to preserve the disputed evidence in the first place.  See Fed. R. Civ. P. 37 advisory committee's note to 2015 amendments ("Many court decisions hold that potential litigants have a duty to preserve relevant information when litigation is reasonably foreseeable. Rule 37(e) is based on this common-law duty; it does not attempt to create a new duty to preserve.  The rule does not apply when information is lost before a duty to preserve arises."); Ala. Aircraft Indus., Inc. v. Boeing Co., No. 20-11141, 2022 WL 433457, at *14 (11th Cir. Feb.

14, 2022) ("[T]he duty to preserve arises when litigation is 'pending or reasonably foreseeable' at the time of the alleged spoliation.").

In light of the parties' arguments, and the differing legal standards, I first address when Defendants' duty to preserve began.  Next, I address Plaintiffs' allegations concerning the spoliation of specific categories of ESI.  Finally, I address Plaintiffs' allegations concerning the spoliation of specific categories of tangible evidence.

## I.      Defendants' Duty to Preserve Evidence

SGT died by suicide on November 19, 2019.  Within two or three days of SGT's death, Dr. John Tucker—a CCSD high school principal and the incoming CCSD superintendent—met with SGT's parents.  Plaintiffs argue Defendants reasonably anticipated litigation once Mr. Tucker met with SGT's parents, and therefore, Defendants had a duty to preserve evidence starting sometime in late November 2019.

Defendants disagree.  Defendants argue Dr. Tucker's knowledge from the meeting with SGT's parents cannot be imputed to Defendants.  Defendants argue Dr. Tucker was not yet the superintendent, he was only a principal at a different school, Dr. Tucker had no records in his possession at the time of the November 2019 meeting, and Dr. Tucker did not tell anyone at CCSD about his belief that a lawsuit would be filed.  Defendants contend they did not reasonably anticipate litigation until June 2020, when Plaintiffs' counsel sent a letter to Defendant CCSD that described Plaintiffs' potential claims.

The date the duty to preserve began is important.  Many of the materials Plaintiffs sought in discovery were lost, destroyed, or deleted between sometime in the spring of 2020, before receipt of the June 2020 letter from Plaintiffs' counsel.  Therefore, the Court must determine when Defendants' duty to preserve began.

A party's obligation to retain documents is only triggered when litigation is reasonably anticipated. In re Delta/AirTran Baggage Fee Antitrust Litig., 770 F. Supp. 2d 1299, 1307 (N.D. Ga. 2011) (citing Managed Care Sols., Inc. v. Essent Healthcare, Inc., 736 F. Supp. 2d 1317, 1324–25 (S.D. Fla. 2010)).  "The duty to preserve relevant evidence must be viewed from the perspective of the party with control of the evidence and is triggered not only when litigation is pending but also when it is reasonably foreseeable to that party." Ala. Aircraft Indus., Inc. v. Boeing Co., 319 F.R.D. 730, 740 (N.D. Ala. 2017).  In determining when a duty to preserve evidence arises, it is appropriate to consider party statements about the anticipation of litigation. See Ala. Aircraft Indus., Inc., 2022 WL 433457, at *14 (determining trial court's conclusion about timing and existence of a duty to preserve was supported by "ample evidence" where the nonmoving party communicated internally that it could "expect an ugly, lengthy legal battle" and nonmoving party executive testified about the date when the moving party "would probably sue").  A court's conclusion about a party's duty to preserve must be supported by ample evidence.  Id.

Plaintiffs contend Defendant CCSD should have reasonably anticipated litigation after Dr. John Tucker's meeting with Plaintiff Kohn because Dr. John Tucker was Defendant CCSD's agent.  Defendant CCSD offered Dr. Tucker as a Rule 30(b)(6) corporate representative during discovery in this case.  During Dr. Tucker's deposition, he expressly stated he visited with Plaintiff Kohn during his transition to the superintendent position.  Dr. Tucker explained that he became convinced during that visit that a lawsuit would be filed.  Specifically, Dr. Tucker— serving as the CCSD entity representative—testified as follows:

| Q: | Do you know when the district became aware that Mrs. Kohn might be bringing a claim against the district related to SGT? |
|---|---|
| Tucker: | After he passed away, I went to visit her, made a home visit, and, you know, I was in the transition between high school principal and superintendent.  I didn't take over until January 1st of 2020, but I did go home, go to her house and visit her and obviously she was upset; she was angry.  And based on, you know, our conversation, I kind of felt what was—that's what was going to take place. |
| Q: | You felt like she would be bringing a claim or ultimately a lawsuit? |
| Tucker: | Yes. |

Doc. 46-8 at 45–46.

Dr. Tucker's testimony is unequivocal.  As the corporate representative of CCSD in this case, Dr. Tucker testified CCSD became aware a lawsuit would be filed just a few days after SGT's death.  Defendant CCSD is bound by this testimony.  Defendants have offered no explanation as to why they should not be bound by the unequivocal testimony of CCSD's Rule 30(b)(6) representative.

Additionally, all the evidence demonstrates Dr. Tucker visited Plaintiff Kohn in his capacity as the incoming CCSD superintendent, not in his personal capacity or even as a CCSD high school principal.  Defendants have offered no plausible explanation for why Dr. Tucker would visit with SGT's parents immediately after SGT's death.  In the alternative, if Dr. Tucker visited with SGT's parents merely as a CCSD a high school principal, that would still likely be sufficient to impute Dr. Tucker's knowledge to CCSD.  As a principal, Dr. Tucker was a high-

ranking official affiliated with CCSD and he visited SGT's parents in that capacity soon after SGT's death.  Based on these facts, CCSD's duty to preserve evidence arose in November 2019.[3]

Defendants raise a few other arguments to show their duty to preserve arose later, but the arguments are unconvincing.  Defendants argue Dr. Tucker did not actually communicate any basis for litigation to the school district in November 2019.  Defendants cite no authority for this argument.  To the contrary, an entity is charged with "constructive knowledge, regardless of its actual knowledge . . . even though the officer or agent does not in fact communicate the knowledge to the corporation."  Gutter v. E.I. Dupont De Nemours, 124 F. Supp. 2d 1291, 1309 (S.D. Fla. 2000).  The law presumes officers or agents have disclosed the knowledge or information to the principal and charges the principal accordingly.  Id.  Dr. Tucker learned SGT's family was likely to initiate a lawsuit in November 2019.  Dr. Tucker then became CCSD superintendent, the executive officer of the board of education, on January 1, 2020.  Even if Dr. Tucker failed to expressly inform CCSD about the potential for litigation when he became superintendent, CCSD still had constructive knowledge of that fact.  There is no plausible argument that a school district superintendent's knowledge of foreseeable litigation should not be imputed to the school district.

Defendants also rely on Dr. James McCarter's testimony to show CCSD did not learn about the potential for litigation until later, but Dr. McCarter's testimony supports the Court's

---

[3]    Even if Dr. Tucker's knowledge could not be imputed to CCSD in November 2019, it surely would be imputed on January 1, 2020—the day Dr. Tucker began serving as the CCSD superintendent. Under Georgia law, the superintendent is the executive officer of the local board of education.  O.C.G.A. § 20-2-109.  Therefore, even if Dr. Tucker were not serving in a role that would warrant imputing his knowledge to CCSD in November 2019, he was in such a role on January 1, 2020.  Therefore, Dr. Tucker's knowledge of the forthcoming lawsuit would be imputed to CCSD no later than January 1, 2020.  Whether CCSD's duty to preserve arose in November 2019, or on January 1, 2020, is likely immaterial.  There is no indication that evidence was lost or destroyed in the brief window between these dates.  Thus, the analysis and outcomes that follow would be the same regardless of whether CCSD's duty to preserve began at the end of November 2019 or on January 1, 2020.

conclusion that the duty to preserve began by the end of November 2019.  Doc. 63 at 3.  Dr. McCarter is the Director of Student Services for CCSD.  Dr. McCarter testified he knew Dr. Tucker met with Plaintiff Kohn, and McCarter knew—within a week or two after that meeting—that Plaintiff Kohn blamed SGT's suicide on the school.  Doc. 50-1 at 28.  Indeed, Dr. McCarter testified that he personally "expected there was a good chance Ms. Kohn would sue" CCSD "[m]aybe two or three weeks" after the incident.[4]  Id.  Additionally, Dr. McCarter knew there was an open investigation related to SGT's suicide.  Id.  In addition to the open investigation, there was an internal school meeting the morning after SGT's suicide where all teachers were present and where all the counselors from the entire school district were present.  Id. at 27; Doc. 50-5 at 37.  Dr. McCarter also asked social workers from the school district to visit Plaintiff Kohn after SGT's suicide.  Doc. 50-1 at 30.  Dr. McCarter also recalled discussing SGT's suicide in a monthly meeting conducted with all the counselors from the entire school district.  Id. at 22.  These facts demonstrate Dr. McCarter knew Plaintiff Kohn blamed the school for SGT's suicide and there was open investigation into SGT's suicide in the days after November 19, 2019.  Thus, Defendants should have reasonably anticipated litigation by the end of November 2019.

Additional evidence from Defendant Burns supports the conclusion that Defendants should have reasonably anticipated litigation by the end of November 2019.  Defendant Burns recalled a meeting with Plaintiff Kohn on November 6, 2019, when they were interrupted several times during their conversation by Defendant Dugger.  Doc. 46-2 at 26–27.  Defendant Burns recalled a tense verbal altercation between Plaintiff Kohn and Defendant Dugger regarding a Federal Impact Aid Form, Plaintiff Kohn ripping up the form, and Defendant Dugger ignoring

---

[4]     Later in his deposition, Dr. McCarter seemingly backtracked on when he anticipated litigation, suggesting that it might not have been until after Defendants received the letter from Plaintiffs' counsel in June 2020.  Doc. 51-1 at 102, 107–112.  At a minimum, Dr. McCarter's testimony is inconclusive about when he personally believed a lawsuit would be filed, and it does nothing to help Defendants' position.

Plaintiff Kohn and interrupting her about the form again.  Plaintiffs state in their Second

Amended Complaint, Plaintiff Kohn refused to complete the Federal Impact Aid Form because

of the bullying problems at St. Marys Middle School and CCSD.  Doc. 54-1 at 13.  A tense

verbal altercation with school administrators in the weeks leading up to SGT's tragic suicide

only adds to the likelihood that Defendants knew Plaintiff Kohn would blame the school, school

administrators, and CCSD for SGT's death, and would likely file suit.

Ample evidence supports the conclusion that Defendants' duty to preserve evidence

began by the end of November 2019.  Dr. Tucker testified Defendant CCSD reasonably

anticipated litigation after meeting with Plaintiff Kohn shortly after SGT's suicide on November

19, 2019.  Additionally, Dr. McCarter's testimony shows CCSD employees were aware of Dr.

Tucker's conversation with Plaintiff Kohn, employees were internally discussing SGT's suicide,

and knew about the open investigation in the weeks after November 19, 2019.  These facts

combined with CCSD's history with Plaintiffs and the verbal altercation 13 days before SGT's

suicide all suggest Defendants should have reasonably anticipated litigation by the end of

November 2019.  Thus, Defendants' duty to preserve evidence began at the end of November

2019.

## II.    ESI

### A.    Legal Standard for Electronically Stored Information

Federal Rule of Civil Procedure 37(e) governs the procedures and sanctions available

when a party spoliates ESI.  Rule 37(e) "forecloses reliance on inherent authority or state law to

determine when certain measures should be used."  Ala. Aircraft Indus., Inc., 2022 WL 433457,

at *13.

Under Rule 37(e), sanctions can only be imposed if: (1) "electronically stored information that should have been preserved in the anticipation or conduct of litigation" was "lost because a party failed to take reasonable steps to preserve it" and (2) that information "cannot be restored or replaced through additional discovery." Thus, by implication, the moving party must show that the information sought did, in fact, exist at a time when the nonmoving party had a duty to preserve that information.

Rule 37(e) establishes two tiers of sanctions, with lesser sanctions under Rule 37(e)(1) and more severe sanctions under Rule 37(e)(2). Skanska USA Civ. Se. Inc. v. Bagelheads, Inc., 75 F.4th 1290, 1311 (11th Cir. 2023). For the first tier, under Rule 37(e)(1), sanctions should only be imposed "where lost electronic evidence causes 'prejudice to another party'" and then sanctions should be "no greater than necessary to cure the prejudice." Id. Thus, Rule 37(e)(1) focuses on the "effect of the violation." Id. The advisory committee notes state measures allowed under Rule 37(e)(1) include, "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation." Fed. R. Civ. P. 37(e)(1) advisory committee note (2015). Some courts have found monetary sanctions to be appropriate under Rule 37(e)(1). See Doe v. Willis, No. 8:21-CV-1576, 2023 WL 2918507, at *16 (M.D. Fla. Apr. 12, 2023); Matter of In re Skanska USA Civ. Se. Inc., 340 F.R.D. 180, 191 (N.D. Fla. 2021).

The Federal Rules of Civil Procedure give courts discretion to allocate the burden of proving or disproving prejudice for purposes of Rule 37(e)(1).[5] On the facts of this case, it is

---

[5]    The advisory committee notes for Rule 37 state:

The rule does not place a burden of proving or disproving prejudice on one party or the

11

appropriate to require Plaintiffs, as the moving parties, to prove prejudice.  There has been

extensive fact discovery and Plaintiffs have had ample opportunity to explore the loss or

destruction of evidence, the likely content of any missing information, and any harm arising from

the loss or destruction of that evidence.  See Silverstein v. Boehringer Ingelheim Pharms., Inc.,

No. 19-CIV-81188, 2020 WL 13119102, at *6–7 (S.D. Fla. Aug. 5, 2020) (discussing allocation

of burden and facts that bear on whether to impose burden on the moving party).

For the second tier under Rule 37(e)(2), sanctions should only be imposed if a court finds

"the party acted with the intent to deprive another party of the information's use in the

litigation."  The "intent to deprive another party of the information's use in the litigation" is the

equivalent of bad faith in other spoliation contexts.  Skanska USA Civ. Se. Inc., 75 F.4th at 1312.

Rule 37(e)(2) sanctions do not require any further finding of prejudice.  Fed. R. Civ. P. 37(e)(2)

advisory committee note (2015).  For Rule 37(e)(2) sanctions, the court may order "adverse jury

instructions, and even dismissal or default judgment."  Id.  Thus, Rule 37(e)(2) focuses on the

cause of the violation and allows for more severe sanctions than Rule 37(e)(1).  Id.

**B.     ESI Analysis**

Plaintiffs allege CCSD failed to preserve six categories of ESI: (1) SGT's emails and

account data for his Google Chromebooks and electronic accounts; (2) Defendant Burns's emails

related to SGT; (3) Defendant Jackson's emails related to SGT; (4) emails from other CCSD

---

other.  Determining the content of lost information may be a difficult task in some cases,
and placing the burden of proving prejudice on the party that did not lose the information
may be unfair.  In other situations, however, the content of the lost information may be
fairly evident, the information may appear to be unimportant, or the abundance of
preserved information may appear sufficient to meet the needs of all parties.  Requiring
the party seeking curative measures to prove prejudice may be reasonable in such
situations.  The rule leaves judges with discretion to determine how best to assess
prejudice in particular cases.

Fed. R. Civ. P. 37(e)(1) advisory committee note (2015).

employees; (5) SGT's academic progress reports and PowerSchool records; and (6) surveillance footage of SGT's physical education class.[6]  I address each category in turn.

> ### 1.  *SGT's emails and account data for his Chromebooks and electronic accounts.*

CCSD provided all students at St. Marys Middle School, including SGT, with Google Chromebooks and electronic accounts.  This allowed students to access various school programs, the internet, and school email accounts.  Doc. 50 at 3.  CCSD hosts its students' account data and emails on Google Cloud, a cloud-based storage system.  Emails are automatically deleted from Google Cloud accounts after four-to-six months.  Defendants searched for these emails in response to Plaintiffs' records request in the summer of 2020 and the emails were not available.  Doc. 63 at 4.

Plaintiffs assert Defendants failed to preserve SGT's emails and account data for his Google Chromebooks and electronic accounts.  Doc. 50 at 3.  Plaintiffs contend Defendants did not take reasonable steps to preserve this information and the information cannot be restored through additional discovery.

There is no dispute this evidence existed or that Defendants failed to preserve the evidence.  Defendants, however, argue they did not act in bad faith in failing to preserve the evidence.  Defendants argue they did not reasonably anticipate litigation until June 2020, and the records were automatically deleted before that date.  Doc. 63 at 4.

---

[6]      The Court treats surveillance footage as ESI, not tangible evidence.  Plaintiffs have not presented any information about how such footage would have been stored, so the Court cannot determine if that footage would have been stored on digital recording devices or through some analog means.  To the extent surveillance footage did exist, it seems more likely a digital recording system would have been used, so the Court treats this disputed evidence as ESI.  To be sure, even if the Court treated the surveillance footage as tangible evidence, the ultimate conclusion would be the same.

Plaintiffs have satisfied the threshold burden under Rule 37 for ESI spoliation sanctions. As an initial matter, Defendants' auto-deletion policy does not inoculate them from spoliation sanctions. "[A] hands-off implementation of an ordinary corporate destruction policy is not a silver bullet." Skanska USA Civ. Se. Inc, 75 F.4th at 1313. Failure to act may still be sanctionable. Here, Plaintiffs have shown SGT's email and account data should have been preserved in anticipation of litigation. The parties agree SGT's emails and online account data existed and should have existed in November 2019, when Defendants' duty to preserve evidence arose. The ESI was lost because of Defendants' failure to take reasonable steps to preserve the evidence, namely disabling automatic deletion. Lastly, Plaintiffs have shown the ESI cannot be restored or replaced through additional discovery as it has already been lost and deleted.

Although Plaintiffs satisfy their threshold burden under Rule 37, the record is not sufficiently developed for the Court to determine whether sanctions should be imposed. For sanctions to be imposed under Rule 37, Plaintiffs would need to demonstrate prejudice or Defendants' intent to deprive Plaintiffs of the evidence. In terms of prejudice, Plaintiffs have provided no information about the likely content of the emails and account data or the significance of those materials. Plaintiffs have not provided any information showing SGT used his email to communicate with other students or teachers. Plaintiffs have not provided any information that indicates SGT was bullied by other students through email. Aside from the fact that SGT had an email account, Plaintiffs have not presented any information about how SGT used that account or the topics that might have been discussed in emails in that account. For the non-email account data, Plaintiffs argue SGT could have used his school account to access his Instagram account or save documents. Plaintiffs only speculate about this usage. Plaintiffs have

not shown SGT used the school device or his school account to access his social media accounts or to save documents.

It is impossible for the Court to determine whether Plaintiffs have been prejudiced by the loss or destruction of this evidence.  Therefore, the Court denies Plaintiffs' request for sanctions related to this category of evidence at this time.   Plaintiffs may continue to explore this category of evidence in discovery, and Plaintiffs may re-raise the request for spoliation sanctions if the issue is sufficiently developed.  Any subsequent request for spoliation sanctions for this category evidence must be filed in this case prior to the deadline for filing civil motions.[7]

### 2.       *Guidance Counselor Defendant Burns's separately saved emails.*

Defendant Burns was the head guidance counselor of St. Marys Middle School at the time of SGT's suicide.  Defendant Burns was responsible for assessing student mental health needs and providing services and accommodations.  Doc. 50 at 4.  Through his role as the head guidance counselor, Defendant Burns had emails pertaining to: SGT's two other threats of self-harm while at school; reports of SGT being bullied; and the crisis response after SGT's suicide.  Id.  All teacher emails are saved on Google Cloud, however, Defendant Burns also saved his emails locally on his computer.  Doc. 63 at 5.  Sometime after those emails were saved on his computer, the email file became corrupted.  Id.  Defendant Burns worked with the IT department to attempt to restore the email file, but he lost approximately one year of saved emails due to this incident.  Id.  The emails saved on Google Cloud were automatically deleted.

---

[7]       Any future briefing should be devoted to the appropriate legal standards and relevant considerations under those standards.  In the current briefing, the parties appear to diverge on the applicable standard and do not address all relevant considerations.  Additionally, discovery is ongoing in this case.  Thus, the Court is compelled to allow renewed requests for sanctions on some categories of evidence addressed in this Order.

Plaintiffs assert Defendants failed to preserve Defendant Burns's emails related to SGT. Id.  Plaintiffs know Defendant Burns possessed relevant emails because two teachers referred SGT to Defendant Burns after SGT threatened self-harm, and Defendant Burns was Plaintiff Kohn's point of contact when she reported the bullying incident from SGT's physical education class.  Id.  Defendant Burns also acknowledged having emails related to SGT.  Doc. 63 at 5; Doc. 46-2 at 87.

Plaintiffs have not satisfied the threshold burden under Rule 37 for ESI spoliation sanctions.  Plaintiffs have shown Defendant Burns's emails should have been preserved in anticipation of litigation.  However, the ESI was not lost because of Defendant Burns's failure to take reasonable steps to preserve the evidence.  Unlike the previous category of information, Defendant Burns took reasonable steps to preserve his emails by archiving the emails locally. Unfortunately, the locally archived emails were lost due to the file corruption issue, an issue beyond Defendants' control.[8]  The advisory committee explains Rule 37(e) "is inapplicable when the loss of information occurs despite the party's reasonable steps to preserve."  Fed. R. Civ. P. 37(e) advisory committee note (2015).

In sum, Defendant Burns took reasonable steps to preserve his emails, but the information was destroyed by an event outside of his control.  Therefore, Plaintiffs have not satisfied the threshold burden under Rule 37 and sanctions are not warranted for this category.

### 3.  *SGT's math teacher Defendant Jackson's separately saved emails.*

Defendant Jackson was SGT's math teacher for the 2019–2020 school year.  On the day of SGT's suicide, Defendant Jackson told SGT she would call SGT's mother, Plaintiff Kohn, regarding an incident with a paper airplane.  Defendant Jackson sent SGT to the Ownership

---

[8]     The parties provided very little information about the file corruption.  Even so, it appears to be undisputed that the files were corrupted and lost for reasons that were beyond any Defendants' control.

Room that day.  Id.  Plaintiffs assert Defendants improperly failed to preserve Defendant Jackson's emails related to SGT.  Doc. 50 at 5.

Defendant Jackson saved some emails locally, separate from the emails saved on Google Cloud.  Id.  However, Defendant Jackson has a practice of deleting all saved emails at the end of every school year.  Id.  In the spring of 2020—sometime between when Dr. Tucker became the superintendent and when Plaintiffs' counsel sent the June 2020 letter to CCSD—Defendant Jackson deleted all emails from the 2019–2020 school year, which would have included emails from the months before and after SGT's suicide.  Id.

Plaintiffs have satisfied the threshold burden under Rule 37 for ESI spoliation sanctions. Plaintiffs have shown Defendant Jackson's email and account data should have been preserved in anticipation of litigation.  The ESI was lost because of Defendants' failure to take reasonable steps to preserve the evidence.  Lastly, Plaintiffs have shown the ESI cannot be restored or replaced through additional discovery as it has already been lost and deleted.

However, Plaintiffs have not met their burden of showing they have been prejudiced by the loss of Defendant Jackson's emails.  Plaintiffs have not provided any information indicating Defendant Jackson possessed emails that would bear on this dispute.  Nothing presented to the Court indicates Defendant Jackson sent or received any emails about SGT during the 2019 school year.  Plaintiffs argue Defendant Jackson's emails could show her response to SGT's suicide, consideration of the discipline she administered, or if she noticed any signs of bullying. However, Plaintiffs merely speculate about what might have been contained in Defendant Jackson's emails.  Plaintiffs have not pointed to any other testimony or evidence showing Defendant Jackson communicated with anyone about SGT, his suicide, or his bullying and discipline via email.  Ultimately, Plaintiffs have not shown they have been prejudiced in this

litigation by the loss or destruction of Defendant Jackson's emails.  Plaintiffs have not met their

burden proving they have been prejudiced; therefore, they are not entitled to Rule 37(e)(1)

sanctions.  Similarly, Plaintiffs have not shown Defendants acted with intent to deprive Plaintiffs

of Defendant Jackson's emails, and therefore, Plaintiffs are not entitled to Rule 37(e)(2)

sanctions.

### 4.    *Other District employees' emails about SGT.*

Plaintiffs argue Defendants failed to preserve emails from other CCSD employees,

mainly teachers at SGT's school, related to SGT.  Doc. 50 at 6.  Defendants have only produced

six emails to or from CCSD employees relating to SGT.  Id.  Plaintiffs contend there should be at

least two more emails from two teachers who previously reported SGT for threats of self-harm or

suicide at school.  SGT's seventh grade language arts teacher, Cody, reported SGT to Defendant

Burns for threatening suicide in December 2018.  Id. at 4.  Sandra Deloach, SGT's ESOL

teacher, also reported SGT for threatening self-harm to Defendant Burns in 2018.  Doc. 46-7 at

16.  Similar to student emails, CCSD employee emails are hosted on Google Cloud and are

automatically deleted four to six months after creation.  Id.

For this category, Plaintiffs focus on the two 2018 incidents, but these incidents do little

to show spoliation.  First, although it is undisputed that Cody and Deloach reported these

incidents, Plaintiffs have not shown that the teachers made these reports by email or

communicated about the reports by email.  Thus, the existence of these reports does little to show

there were also emails about the reports.  Second, these incidents occurred almost a year before

SGT's death in November 2019.  CCSD emails stored on the Google Cloud are automatically

deleted four to six months after creation.  Emails related to the two 2018 incidents would have

been automatically deleted long before CCSD reasonably anticipated litigation, and therefore,

before CCSD had a duty to preserve evidence.  Aside from the 2018 incidents, Plaintiffs do not present any evidence that suggests other CCSD employees sent or received any relevant emails about SGT or that such emails were not properly preserved.

Plaintiffs have not shown any evidence in this category existed that should have been preserved.  The two examples provided by Plaintiffs do little to show other evidence also existed.  Because Plaintiffs have not shown this category of evidence even exists, Plaintiffs do not satisfy the conditions of Rule 37 warranting sanctions.

**5.    *SGT's PowerSchool records.***

CCSD student progress reports are saved in the PowerSchool system.  Plaintiffs state the progress reports contain teacher comments directly relevant to the Rehabilitation Act and Equal Educational Opportunity Act claims.  Doc. 64 at 10.  Plaintiffs assert Defendants failed to preserve and destroyed SGT's academic progress reports and PowerSchool records from SGT's time at St. Marys Middle School.  Doc. 50 at 9.  Plaintiffs argue since some of the progress reports are missing, this suggests other PowerSchool records were also deleted.  Id.  However, Plaintiffs fail to explain what records other than progress reports might be included in this category.

Plaintiffs point to Dr. James McCarter's deposition as evidence the progress reports and PowerSchool Records were not saved.  Id.  Dr. McCarter is the Director of Student Services at CCSD.  In his deposition, Dr. McCarter testified he was unaware of how documents were saved in the PowerSchool system.  Doc. 50-1 at 72.  Plaintiffs argue if Dr. McCarter, as CCSD's representative for its document preservation policy, is unaware of how documents are saved then this raises concerns about other documents that may have been deleted.

Defendants' response is somewhat unclear.  Defendants do not say whether SGT's progress reports and other PowerSchool records existed or were not preserved.  Instead, Defendants argue SGT's quarterly and semester grades were produced in discovery and should be sufficient to satisfy Plaintiffs' requests.  Doc. 63 at 8.  Both Plaintiffs and Defendants acknowledge Plaintiff Kohn personally retained progress reports from a previous year.  Doc. 50-10 at 2–5.

Plaintiffs have not satisfied their burden to show they are entitled to sanctions.  As an initial matter, it is unclear if SGT's progress reports and other PowerSchool records existed in November 2019.  Even if the records existed, and Plaintiffs satisfied the threshold requirements of Rule 37, Plaintiffs have not shown they were prejudiced by the loss or destruction of the evidence.  As to the progress reports, Plaintiffs assert the teacher comments on the progress reports are essential to their case.  But Plaintiffs provided examples of progress reports, and the teacher comments in those reports are extremely limited.  Doc. 50-10.  The comments consist of just a few words, and only a few teachers provided comments in each report.  It is speculative to assume the missing progress reports provided more detailed comments, or more informative comments, than the examples provided.  Additionally, Defendants have produced SGT's quarterly and semester grades and produced a progress report from SGT's eighth grade year, which provides some information about SGT's academics and mitigates any prejudice.  Doc. 63 at 8.  Plaintiffs also possess some previous progress reports.  Id.  The lack of important information on the progress reports, combined with the additional documents that are available, cuts against any prejudice Plaintiffs may have suffered from the loss or destruction of this category of evidence.  Therefore, Rule 37(e) sanctions are not warranted for this category of evidence.

6.     *Surveillance footage of SGT's physical education class.*

Plaintiffs assert Defendants failed to preserve surveillance footage of SGT's physical education class showing a bullying incident (or incidents) from October 2019.  Doc. 50 at 10. Plaintiffs allege there were surveillance cameras in the gym due to a prior bullying incident at the school involving SGT's brother.  Id.  Plaintiffs state they have personal knowledge about the installation of cameras in the gym.  Plaintiffs contend there must be "at least some surveillance footage of the bullying SGT experienced."  Id. at 10–11.

Defendants state there is no surveillance footage and the alleged footage never existed. Doc. 63 at 9.  Defendants state there is no evidence of any October 2019 bullying incidents, and Plaintiffs have not provided the date of the incidents or any details about the incidents. Defendants argue Plaintiffs are speculating about the existence of this surveillance footage.  Id. No surveillance footage has been produced in this case.

Plaintiffs have not shown that footage of the October 2019 bullying incidents ever existed.  Although it is undisputed that there are surveillance cameras in the gym at St. Marys Middle School, not all areas of the gym can be seen by the surveillance cameras.  Indeed, Dr. Tucker testified in his deposition about surveillance camera blind spots.  Doc. 46-8 at 121–22. Plaintiffs have not provided the precise date of the incidents, who was involved in the incident (other than SGT), or where in the gym the incidents occurred.  Plaintiffs generally speculate that footage must exist, but they have not pointed to any evidence indicating the footage did, in fact, exist.  Plaintiffs are not entitled to sanctions with regard to this category of evidence.

III.     **Tangible Evidence**

     A.     **Legal Standard for Tangible Evidence**

Federal law governs the imposition of sanctions for failure to preserve tangible evidence

in a federal-question suit.  Stanfill v. Talton, 851 F. Supp. 2d 1346, 1361 (M.D. Ga. 2012).

"Nevertheless, because federal law in the Eleventh Circuit does not set forth specific guidelines

for adjudicating spoliation claims," at least not for tangible evidence, "[courts] may also consider

those spoliation principles found in Georgia law which are consistent with federal spoliation

principles."  Daniels v. United States, 86 F. Supp. 3d 1375, 1379 (S.D. Ga. 2015).  In

determining whether to impose sanctions for the spoliation of tangible evidence, courts should

consider the following factors under Georgia law: "(1) prejudice to the non-spoiling party as a

result of the destruction of evidence; (2) whether the prejudice can be cured; (3) practical

importance of the evidence; (4) whether the spoiling party acted in good or bad faith; and (5) the

potential for abuse if expert testimony about the evidence was not excluded."  Id. (citing Flury v.

Daimler Chrysler Corp., 427 F.3d 939, 945 (11th Cir. 2005)).  These factors are occasionally

referred to as the "Flury factors."

     If a court determines sanctions should be imposed, the court has broad discretion in

determining the appropriate sanction.  Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th

Cir. 2005).  "Appropriate sanctions may include an adverse judgment, the denial of a defendant's

motion for summary judgment, issuing jury instructions that raise a presumption against the

spoliator, or the exclusion of evidence."  In re Delta, 770 F. Supp. 2d at 1305.

     Plaintiffs ask the Court to sanction Defendants by instructing the jury that it should make

an adverse inference for any lost or destroyed evidence.  A failure to preserve tangible evidence

warrants the sanction of an adverse inference "only when the absence of that evidence is

predicated on bad faith." <u>Bashir v. Amtrak</u>, 119 F.3d 929, 931 (11th Cir. 1997).  A party may establish bad faith through direct or circumstantial evidence.  <u>Id.</u>  To establish bad faith by circumstantial evidence, the moving party must establish all four of the following facts:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

<u>Calixto v. Watson Bowman Acme Corp.</u>, No. 07-60077, 2009 WL 3823390, at *16 (S.D. Fla. Nov. 16, 2009).  "While this circuit does not require a showing of malice in order to find bad faith, mere negligence in losing or destroying records is not sufficient to draw an adverse inference."  <u>Mendez v. Wal-Mart Stores E., LP</u>, 67 F.4th 1354, 1362 (11th Cir. 2023).

### B.    Tangible Evidence Analysis

Plaintiffs allege CCSD failed to preserve four categories of tangible evidence: (1) SGT's ESOL records; (2) Defendant Dugger's logbook; (3) administrative meeting agendas; and (4) documentation regarding SGT being sent to the "Ownership Room."

#### 1.    *SGT's ESOL records.*

SGT was a student in CCSD's English to Speakers of Other Languages ("ESOL") program.  Doc. 50 at 6.  As part of the ESOL programming, CCSD has certain reporting requirements, which include maintaining reclassification forms and monitored student reviews.

Plaintiffs argue documents related to SGT's transfer out of ESOL were not preserved or produced.  When a student is transferred out of ESOL and a student's testing falls within a certain range, a school district is required to complete a reclassification form.  <u>Id.</u> at 7.  Once a

student is reclassified, the student becomes a "monitored student" and the student's academic progress is periodically assessed using a monitored student review form.  Id.

Sandra DeLoach, SGT's ESOL teacher, stated that a reclassification form should have been created for SGT and there should have been at least two or three monitored student reviews completed for SGT by November 2019.  Doc. 46-7 at 43, 53.  All of the student reviews, forms, and paperwork for SGT would have been kept by Ms. DeLoach in SGT's folder.  Id. at 44.  Ms. DeLoach testified she turned SGT's folder in to the guidance counselor, Defendant Burns, immediately after SGT's death.  Id. at 48.  It was standard practice for Ms. DeLoach to turn over a student's folder once she was no longer working with them.  Id. at 12.

It is undisputed that the contents of SGT's ESOL folder have not been produced.  Neither the reclassification form nor the monitored student reviews have been produced during discovery.  Defendants produced documents from the 2018–2019 school year, but these do not relate to SGT's monitored status and progress for the academic year starting in the fall of 2019.  Plaintiffs contend Defendants failed to preserve or produce SGT's reclassification form, any of SGT's monitored student reviews, or other documents from his ESOL folder.  Doc. 50 at 8.  Plaintiffs emphasize that SGT's ESOL Coordinator Sandra DeLoach testified that additional ESOL documents were created, but Plaintiffs maintain these documents were not produced.  Doc. 64 at 7.

Defendants' argument is difficult to discern, but it appears Defendants argue Plaintiffs have not shown there are ESOL records that existed, but that have not been produced.  Doc. 63 at 6.  Defendants provided certain ESOL documents that were produced in discovery as proof that some ESOL documents were produced to Plaintiffs, but these documents do not include all the

documents Plaintiffs contend should have been preserved, such as monitored student reviews. Doc. 63-2.

The Court considers each of the five <u>Flury</u> factors.  Plaintiffs have shown they were prejudiced as a result of the loss or destruction of the ESOL records.  SGT's ESOL records are relevant to Plaintiffs' Equal Educational Opportunity Act claim and would have shown SGT's progress as an ESOL student leading to his exit from ESOL services.  Without access to these records, Plaintiffs are hindered in their ability to develop facts and evidence about the circumstances that led to SGT's transfer out of ESOL services.  Plaintiffs are also unable to evaluate evidence showing SGT's progress as a monitored student after leaving ESOL services.  Plaintiffs must rely on Defendants' own testimony to understand the decision to remove SGT from ESOL services and his progress after leaving ESOL services.  Plaintiffs have shown prejudice.

The second <u>Flury</u> factor is whether the prejudice can be cured.  Defendants suggest the prejudice can be cured because Defendants provided some documents pertaining to SGT's ESOL status and monitored student reviews.  Doc. 63 at 6–7.  Defendants state emails relating to SGT's monitored student reviews were produced and used during Ms. DeLoach's deposition.  These emails include documentation from a conference with SGT's parents at the end of SGT's first monitored status year, 2018–2019.  Doc. 63-2.  The documents provided by Defendants show efforts to monitor SGT's academic progress after his transition from ESOL services, but the documents do not sufficiently show the basis for the decision to transfer SGT out of ESOL services.  Because Defendants provided some documents related to SGT's status as a monitored student, this factor weighs slightly in Defendants' favor.

Third, the Court must consider the practical importance of the ESOL records.  Plaintiffs state the ESOL records directly relate to their Equal Educational Opportunity Act claims.  SGT's experience in the ESOL program was a significant part of his experience at school.  His progress through the program and information about how he was faring in the classroom with his teachers and peers directly relates to the Plaintiffs' claims.  This factor weighs in Plaintiffs' favor.

Fourth, the Court must consider whether Defendants acted in bad faith.  In Georgia, finding bad faith does not require a showing of malice.  Flury, 427 F.3d at 946.  However, courts are to "weigh the degree of the spoliator's culpability against the prejudice to the opposing party." Id.  In Flury, the court determined culpability rested solely on the plaintiff where the plaintiff was the only party who knew of the spoliated vehicle's location and thus was the only party who could preserve it.  Id.  Similarly, here, Defendants were the only ones who knew about the ESOL folder and its location, therefore Defendants were the only party who could preserve it.  There is no explanation for what happened to SGT's ESOL folder after it was turned in to Defendant Burns, and Plaintiffs point to no affirmative act causing the loss.  Plaintiffs have not shown Defendants purposely lost or destroyed this evidence.  Even so, SGT's ESOL folder was plainly relevant, if not important to Plaintiffs' claims, and Defendants should have preserved and produced it.  Thus, the bad faith factor tips slightly in favor of the Plaintiffs but does not rise to the level warranting an adverse inference.

Finally, the fifth factor is whether there is any potential for abuse if expert testimony about the evidence is not excluded.  Neither party has shown the ESOL records affect any expert testimony.  Without knowing details about any expert testimony, the Court cannot reach a conclusion on this factor.  This factor is inconclusive.

On balance, these five factors warrant some sanctions, but not to the full extent Plaintiffs request.  An adverse inference remedy would be inappropriate in this case.  Plaintiffs are entitled to sanctions and will need to provide supplemental briefing on the appropriate remedy.

### 2.      *Vice Principal Defendant Dugger's call logbook.*

Defendant Dugger was the Vice Principal at St. Marys Middle School in the fall of 2019. In her role as Vice Principal, Defendant Dugger was the administrator in charge of school discipline.  Defendant Dugger kept a phone log where she kept a record of all phone calls made and received during the day, along with notes about the substance of the calls.  Doc. 50-8 at 105. Upon Defendant Dugger's retirement, her phone log and other belongings were boxed up and left with CCSD for storage.  Id.  Nothing from the phone log has been produced in discovery. Doc. 50 at 8.  Plaintiffs assert Defendants failed to preserve Defendant Dugger's logbook.  Doc. 50 at 8.  Plaintiffs contend the logbook contained information about a disciplinary incident involving SGT a week before his death, for which Defendant Dugger imposed a week of lunch detention as a punishment.  Plaintiffs also contend the logbook contained information about Defendant Dugger's efforts to pressure SGT's parents to fill out a federal aid form.  Defendants do not dispute the logbook existed, that it contained information related to SGT, or that the logbook has been lost or destroyed.  Doc. 63 at 7.  Instead, Defendants argue Plaintiffs cannot demonstrate prejudice or bad faith.

Plaintiffs have sufficiently shown the logbook existed and that it contained information about SGT.  Defendant Dugger testified that she received phone calls from other parents related to a disciplinary action involving SGT that occurred about a week before SGT's death.  Doc. 50-8 at 104.  Additionally, the record indicates Defendant Dugger may have made a call to SGT's parents about a Federal Impact Aid Form and that she would have recorded the call in the

logbook.  The Federal Impact Aid Form is a survey for students' parents required for school districts participating in the Federal Impact Aid Program.  Part of Plaintiffs' Americans with Disabilities Act claim is based on Defendant Dugger's actions in response to Plaintiff Kohn's refusal to complete the form.[9]  Doc. 54 at 21.  Defendant Dugger recalled possibly making a phone call to SGT's parents about the Federal Impact Aid Form that would have been recorded in the phone log, but she could not specifically recall making any phone calls to SGT's parents.  Doc. 50-8 at 137.  Defendant Dugger does, however, remember attending a meeting with SGT's parents to provide the parents with the Federal Impact Aid Form.  Id.  Thus, it is undisputed that the logbook existed, and it contained some information concerning SGT.

Turning to the first Flury factor, Plaintiffs have shown they were somewhat prejudiced by the loss or destruction of the logbook, but the prejudice is minimal.  Plaintiffs claim the logbook is important to their negligence claims and to establish Defendant Dugger's state of mind before assigning SGT lunch detention as a punishment for the disciplinary incident that occurred the week before SGT's suicide.  Doc. 50 at 16.  To the extent the logbook contained details about Defendant Dugger's conversations with other parents, Plaintiffs are prejudiced because they are unable to evaluate for themselves the reasons for SGT's disciplinary action.  The logbook also, potentially, contained information about Defendant Dugger's call to SGT's parents about the Federal Impact Aid Form.  However, SGT's parents can offer their own testimony about the call.  Thus, this initial factor slightly tilts in Plaintiffs' favor.

---

[9]       In Plaintiffs' Complaint, Plaintiffs allege Defendant Dugger pressured Plaintiff Kohn to complete the Federal Impact Aid Form.  Plaintiff Kohn refused because of the school's poor response to bullying incidents involving SGT.  Doc. 1 at 5.  Plaintiffs allege this refusal "incensed" Defendant Dugger and Defendant Dugger retaliated by pulling SGT out of class, threatening SGT with punishment, and threatening to call Plaintiff Kohn's work supervisors.  Id.

The second <u>Flury</u> factor is whether the prejudice can be cured.  Defendants suggest the prejudice can be cured through Defendant Dugger's deposition testimony.  Defendant Dugger recalled the substance of the phone calls with other parents leading up to SGT's lunch detention and the interaction with SGT's parents regarding the Federal Impact Aid Form during Defendant Dugger's deposition.  Doc. 63 at 7.  However, Defendant Dugger's testimony is not an adequate substitute for the evidence that has been lost.  <u>Pinkney v. Winn-Dixie Stores, Inc.</u>, No. CV214-075, 2015 WL 858093, at *5 (S.D. Ga. Feb. 27, 2015) (concluding that allowing a party to avoid spoliation sanctions through the testimony of its witness that the destroyed evidence "turn spoliation law on its head") (quoting <u>Brown v. Chertoff</u>, 563 F. Supp. 2d 1372, 1379 (S.D. Ga. June 18, 2008)).  Plaintiffs cannot at this point determine how many parents called Defendant Dugger, who called Defendant Dugger, or what Defendant Dugger's contemporaneous notes about the calls reflected.  Thus, prejudice related to these calls cannot be cured.  As to portions of the logbook related to Defendant Dugger's call to SGT's parents, prejudice from destruction of this portion of the logbook can be mitigated.  SGT's parents can offer their own testimony about any call that occurred.  Ultimately, this factor weighs in favor of Plaintiffs.

Third, the Court must consider the practical importance of the logbook.  Plaintiffs state the logbook is relevant to Plaintiffs' negligence claims and proposed Rehabilitation Act claim.  The logbook would provide insight into the investigation conducted by Defendant Dugger and her conversations with other parents before disciplining SGT.  Plaintiffs have not demonstrated that the disciplinary incident and punishment were related to the bullying SGT experienced and the school's response to the bullying incidents.  However, evidence need not touch on the focal point of litigation to be of practical importance.  <u>See</u> <u>Daniels</u>, 86 F. Supp. 3d at 1382.  Even if the disciplinary incident and punishment did not relate to bullying, these circumstances may have

contributed to SGT's stress at school and may help explain Defendant Dugger's actions. Regarding the Federal Impact Aid Form, the logbook is somewhat important, but SGT's parents are also able to provide testimony regarding those conversations.  Thus, the logbook was somewhat important to this case, so this factor cuts slightly in Plaintiffs' favor.

Fourth, Plaintiffs have not shown Defendants lost or destroyed the logbook in bad faith. Bad faith does not require a showing of malice.  Flury, 427 F.3d at 946.  Courts are to "weigh the degree of the spoliator's culpability against the prejudice to the opposing party."  Id.  Similar to Flury, Defendants were the only ones who knew about Defendant Dugger's logbook and its location.  Defendants were the only party able to preserve the logbook.  The logbook was left with a box of Defendant Dugger's belongings upon her retirement.  There is no explanation for what happened to Defendant Dugger's logbook and Plaintiffs point to no affirmative act causing the loss.  Defendants presumably knew the value of Defendant Dugger's logbook, as Defendant Dugger was a high-ranking school administrator at the time of SGT's suicide who directly interacted with SGT and his parents just before SGT's death.  Defendants should have understood the value of the logbook in any future litigation.  However, Plaintiffs have also not shown Defendants purposely lost or destroyed the logbook.  Under these circumstances, and in light of the fact that Plaintiffs have been prejudiced, this factor tips slightly in favor of the Plaintiffs, but Plaintiffs have not shown Defendants' conduct rises to the level of bad faith required for the Court to impose an adverse inference.

Finally, the fifth factor for the Court to consider is whether there is any potential for abuse if expert testimony about the evidence is not excluded.  Neither party has shown the logbook affects any expert testimony.  Without knowing details about any expert testimony, the Court cannot reach a conclusion on this factor.  This factor is inconclusive.

On balance, these five factors warrant some sanctions, but not to the full extent Plaintiffs request.  An adverse inference remedy would be inappropriate in these circumstances.  Plaintiffs are entitled to sanctions and will need to provide supplemental briefing on the appropriate remedy.

### 3.    *Administrative meeting agendas.*

St. Marys Middle School conducted weekly administrative meetings to discuss school related topics.  Doc. 50-8 at 40–43.  The principal, vice principal, assistant principals, guidance counselors, special educations coordinators, and other guests attended the meetings.  The school principal solicited suggestions for topics for the meetings and, ultimately, set the meeting agenda.  Agendas for the meetings were usually handed out in person at the meeting.  At some point during these meetings, participants discussed a "cultural problem" of bullying at the school.  Meeting participants discussed practices that would help mitigate bullying, including increasing supervision of students.

Plaintiffs assert Defendants failed to preserve administrative meeting agendas that focused on bullying.  Doc. 50 at 9.  Plaintiffs argue the meeting agendas would demonstrate what the culture of bullying was like at St. Marys Middle School.  Id. at 16.  Plaintiffs assert Defendants' responses to bullying incidents involving SGT are central to the claims in the case, and therefore, the lost or destroyed meeting agendas were critical pieces of evidence.  Defendants state these records were never requested in discovery, Plaintiffs were not prejudiced by Defendants not producing these records, and there is no evidence to support a claim for bad faith destruction.  Doc. 63 at 8.

The dispute about the weekly administrative meeting agendas is not sufficiently developed for the Court to rule on the issue.  On one hand, the information provided to the Court

demonstrates school-wide bullying issues were discussed at the administrative meetings, the meeting agendas would reflect those topics, and the information would be germane to Plaintiffs' claims.  On the other, Defendants contend Plaintiffs never requested the meeting agendas in discovery, and Defendants have not searched for the agendas.  Additionally, there is no indication about when meetings concerning bullying occurred or how copies of the agendas might have been maintained (for example, in hardcopy or digital form).  Thus, it is impossible for the Court to determine if relevant meeting agendas existed at the time Defendants' duty to preserve evidence arose.  Similarly, it is impossible for the Court to assess several of the Flury factors based on the threadbare information provided to the Court.  Therefore, the Court denies Plaintiffs' request for sanctions related to this category of evidence at this time.   Plaintiffs may continue to explore this category of evidence in discovery, and Plaintiffs may re-raise the request for spoliation sanctions if the issue is sufficiently developed.  Any subsequent request for spoliation sanctions for this category of evidence must be filed in this case prior to the deadline for filing civil motions.

       *4.       Documentation regarding SGT being sent to the "Ownership Room."*

If a student at St. Marys Middle School misbehaves in class, they are directed to leave the classroom, and they are sent to the Ownership Room.  When a teacher sends a student to the Ownership Room, the teacher fills out a paper form to provide information about the student to the Ownership Room teacher, including the reason, date, and time.  Doc. 50-11 at 41.  Defendant Jackson sent SGT to the Ownership Room on the day of his death, November 19, 2019.  Doc. 50-5 at 33.

Plaintiffs assert Defendants failed to preserve documents related to SGT being sent to the Ownership Room.  Doc. 50 at 10.  Plaintiffs focus on the form that would have been completed

on November 19, 2019, but it appears Plaintiffs also seek forms related to other times SGT was sent to the Ownership Room, and, perhaps, other documentation related to the Ownership Room. Defendants allege there is no evidence to suggest this documentation is preserved for any student after they are sent to the Ownership Room.  Doc. 63 at 9.  The only purpose this documentation serves is to inform Ownership Room teachers of that information.  Id.  Defendants maintain there is no evidence this documentation is routinely maintained.

Like the dispute about the weekly administrative meeting agendas, I find the issue concerning Ownership Room documentation is not sufficiently developed for the Court to rule on the issue.  The fact that SGT was sent to the Ownership Room on the day of his death increases the significance of evidence related to that disciplinary incident.  It is noteworthy that the circumstances of the disciplinary incident seem to be somewhat disputed, with Defendant Jackson having only limited recollection about her reasons for sending SGT to the Ownership Room.  Doc. 50-5 at 34.  Documentation about prior instances where SGT was sent to the Ownership Room may also be relevant.  However, Plaintiffs have provided no evidence that such documentation existed beyond the date it was created.  Thus, it is impossible for the Court to determine if relevant Ownership Room documentation even existed at the time Defendants' duty to preserve evidence arose.  Similarly, it is impossible for the Court to assess several of the Flury factors based on the threadbare information provided to the Court.  Therefore, the Court denies Plaintiffs' request for sanctions related to this category of evidence at this time.  Plaintiffs may continue to explore this category of evidence in discovery, and Plaintiffs may re-raise the request for spoliation sanctions if the issue is sufficiently developed.  Any subsequent request for spoliation sanctions for this category of evidence must be filed in this case prior to the deadline for filing civil motions.

**CONCLUSION**

For the reasons set forth above, I **GRANT in part** and **DENY in part** Plaintiffs' Motion. I grant the portions of Plaintiffs' Motion concerning spoliation of SGT's ESOL records and Defendant Dugger's call logbook. For these portions of the Motion, I conclude Plaintiffs are entitled to sanctions, however they do not rise to the level of drawing an adverse inference. Therefore, Plaintiffs are **ORDERED** to submit supplemental briefing within 21 days of this Order on the nature of the sanctions requested.

I deny the remaining portions of Plaintiffs' Motion. However, as explained in this Order, Plaintiffs are permitted to renew their requests for sanctions at a later time on certain categories of evidence if the record supports renewed requests.

**SO ORDERED**, this 28th day of March, 2024.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA