IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| CAROL KOHN, mother and legal guardian of Sebastian Gonzalez Torres; and ESTATE OF SEBASTIAN GONZALEZ TORRES, <br><br> Plaintiffs, <br><br> v. <br><br> CAMDEN COUNTY SCHOOL DISTRICT, et al., <br><br> Defendants. | CIVIL ACTION NO.: 2:21-cv-108 |

**O R D E R**

Defendants filed a Motion to Exclude Expert Testimony of Dr. Sheila Crowell. Doc. 82. Plaintiffs filed a Response in opposition. Doc. 86. For the reasons set forth below, the Court **DENIES** Defendants' Motion to Exclude Expert Testimony of Dr. Sheila Crowell. Doc. 82.

**BACKGROUND**

This case involves various claims arising from the death of SGT, a minor and former student at St. Marys Middle School in the Camden County School District. Doc. 54-1. Plaintiffs allege SGT died of suicide because of multiple bullying incidents at the school and Defendants' failures to adequately respond to and address those incidents. Plaintiffs assert claims under the Americans with Disabilities Act ("ADA") and Georgia law.

Plaintiffs retained a psychology expert, Dr. Sheila Crowell, to opine on the causal chain of stressors leading to SGT's suicide and SGT's symptoms of ADHD. Doc. 82-1. Dr. Crowell is a tenured Psychology Professor at the University of Utah. Id. at 2. She has been a licensed and practicing psychologist since 2013. Id. Dr. Crowell has received funding from the

American Foundation for Suicide Prevention and the National Institutes of Health to better understand and prevent suicide.  Dr. Crowell has produced 115 peer-reviewed and invited publications, of which 30 publications deal directly with the topic of suicide or self-injury.  Id. Dr. Crowell states she is an expert in Dialectical Behavior Therapy ("DBT") and has directed the DBT treatment program at the Utah Center for Evidence Based Treatment since 2013.  Id.  Dr. Crowell explains DBT was developed specifically for the prevention of self-harm and suicide. Id.  Dr. Crowell explains she has "overseen hundreds of clinical cases involving children, adolescents, and adults at high risk for suicide."  Id.  Dr. Crowell also explained her Master's thesis, and her ongoing research, concerns adolescents with self-injurious thoughts and behaviors.  Doc. 82-2 at 7–9.

In her report, Dr. Crowell opined SGT experienced stress as a result of actions and inactions by staff at St. Marys Middle School and the cumulative nature of these stressors exceeded the typical level of stress most children encounter.  Id. at 4.  Dr. Crowell stated the stressors included peer bullying at school, academic struggles at school, and discipline at school. Id.  For peer bullying, Dr. Crowell observed a pattern of inaction by the school to bullying SGT and his brother experienced.  Id.  For academic struggles, Dr. Crowell noted the school neglected to provide SGT with any accommodations or attempt to educate his parents about accommodations despite being on notice of SGT's ADHD diagnosis.  Id.  For discipline at school, Dr. Crowell noted the school's response to SGT's ADHD symptoms was discipline rather than other forms of support, despite having notice of SGT's heightened risk for self-harm. Id.  Dr. Crowell opined the school's actions and inactions likely increased SGT's vulnerability to mental health struggles.  Id.

Dr. Crowell opined there was a clear precipitating event for SGT's suicide on November 18, 2019. SGT made "origami rockets" for a classmate on November 15, 2019. Id. at 3. The classmate threw the origami rockets in the math classroom, and one got stuck in the ceiling. On November 18, 2019, Ms. Jackson sent SGT to the "ownership room" for this incident. Id. The "ownership room" was described by a school official as a form of in-school suspension and is a space for students to "cool down." SGT has been sent to the "ownership room" four times since classes began in August 2019. Id. Dr. Crowell opined this event appears to have been on the forefront of SGT's mind on the day he died by suicide. Id. at 4. Dr. Crowell opined the primary actions by school staff to manage SGT's behavior were based on principles of punishment rather than support, accommodations, or remediation. Id.

In Dr. Crowell's deposition, she detailed a process called "chain analysis." Doc. 82-2 at 12. Dr. Crowell conducts a chain analysis after any incident of self-harm with a patient and did one for SGT after his suicide. Id. "[A] chain analysis is where you go through the chain of events that led to a person harming themselves." Id. Dr. Crowell described a chain analysis as follows:

> [W]e start with the precipitating event, and then we look at the links in the chain to the self harm. And the links include things like thoughts, emotions, biological responses, and behaviors. And so we look at each of those links in the chain and then we will go back to things before the precipitating event that might have increased vulnerability, like not sleeping well the night before, not having had lunch, to sort of understand the course of that day for a person.

Id. Dr. Crowell explained that there is a "critical" time period for performing a chain analysis. Dr. Crowell stated, "Usually you are looking at factors within that day. Because most people contemplate suicide for only a few minutes before they act." Id.

Defendants ask the Court to exclude Dr. Crowell's opinions. Doc. 82. Defendants argue Dr. Crowell formed her opinions based on information that was narrowly focused on stressors

3

SGT experienced at school, and Dr. Crowell did not sufficiently consider stressors outside the school.  Id. at 2–3.  Defendants also argue Dr. Crowell's methodology is not reliable and her opinions will not assist the trier of fact.  Id. at 3–4.

## LEGAL STANDARD

The United States Supreme Court's holding in Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993), and the text of Rule 702 require trial judges to serve as gatekeepers in determining the admissibility of expert testimony; however, any decision regarding admissibility is not a position on the strength or weight of the testimony.  Fed. R. Evid. 702; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).  In this Circuit, courts routinely look to three elements to determine if expert testimony is admissible under Daubert and Rule 702.  As the Eleventh Circuit Court of Appeals has stated, the elements for consideration are whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citations omitted).  "[A]lthough there is some overlap among the inquiries into an expert's qualifications, the reliability of his proffered opinion and the helpfulness of that opinion, these are distinct concepts that courts and litigants must take care not to conflate."  Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003).  The trial court has broad latitude in evaluating each of these three factors.

As to qualifications, an expert may be qualified "by knowledge, skill, training, or education."  Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1193 (11th Cir. 2010).  The expert need not have experience precisely mirroring the case at bar in order to be qualified.  Maiz

4

v. Virani, 253 F.3d 641, 665 (11th Cir. 2001).  However, where an expert does have experience directly applicable to an issue at bar, experience alone may provide a sufficient foundation for expert testimony.  Frazier, 387 F.3d at 1261.

As to reliability, courts look, when possible, to: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.  Daubert, 509 U.S. at 593–94.  However, these factors are not exhaustive, and "a federal court should consider any additional factors that may advance its Rule 702 analysis."  Quiet Tech., 326 F.3d at 1341.  At all times in this flexible inquiry, the court's focus must be "solely on principles and methodology, not on the conclusions that they generate."  Seamon v. Remington Arms Co., LLC, 813 F.3d 983, 988 (11th Cir. 2016) (citation omitted).

Finally, as to the third element, expert testimony is likely to assist the trier of fact to the extent "it concerns matters beyond the understanding of the average lay person and logically advances a material aspect of the proponent's case."  Kennedy v. Elec. Ins. Co., Case No. 4:18-cv-148, 2019 WL 2090776, at *5 (S.D. Ga. May 13, 2019) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 591 (1993)); Frazier, 387 F.3d at 1262–63.  Rule 702 permits experts to make conclusions based on competing versions of the facts, but those conclusions must still assist the trier of fact by explaining something that is "beyond the understanding of the average lay person."  Jackson v. Catanzariti, No. 6:12-CV-113, 2019 WL 2098991, at *10 (S.D. Ga. May 14, 2019) (citing United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004)).  Expert testimony generally will not help the trier of fact "when it offers nothing more than what lawyers for the parties can argue in closing arguments."  Id. (quoting Cook v. Sheriff of Monroe Cnty.,

402 F.3d 1092, 1111 (11th Cir. 2005)).  Such testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves."  Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys., 50 F.3d 908, 917 (11th Cir. 1995) (citations omitted).

"The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence."  Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999); McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002).  However, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of proffered evidence."  Quiet Tech., 326 F.3d at 1341.  Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.

## DISCUSSION

Defendants argue Dr. Crowell's methodology is unreliable, and Dr Crowell only considered information about stressors SGT experienced at school and did not consider stressors outside the school.  Doc. 82 at 2.  Defendants also argue Dr. Crowell's opinions do not assist the trier of fact.  Id. at 3–4.

Plaintiffs argue Dr. Crowell's methodology is reliable because she considered information about stressors SGT considered at school and at home.  Doc. 86 at 1–2.  Plaintiffs contend Dr. Crowell's opinions assist the trier of fact because they are directly related to the issue of contributing proximate cause of a suicide or attempted suicide.  Id. at 3–4.

**I.       Dr. Crowell's Opinions Are Based on Reliable Methodology**

Defendants argue Dr. Crowell's methodology is not reliable for two reasons.  First, Defendants contend Dr. Crowell's opinions are based solely on deposition testimony that was narrowly focused on stressors SGT may have encountered at school.  Doc. 82 at 2.  Defendants argue SGT could have encountered other stressors, including discipline at home, interactions with peers outside of school, and SGT's relationship with his parents, but Dr. Crowell did not consider these additional stressors in forming her opinions.  Id.  Second, Defendants argue Dr. Crowell's "chain analysis" is merely Dr. Crowell's subjective opinion that is unable to be tested.  Id. at 3.

Plaintiffs respond to both of Defendants' attacks.  Doc. 86 at 1–2.  Plaintiffs argue Dr. Crowell did consider stressors outside of school as part of her review.  Id. at 1.  Specifically, Plaintiffs state Dr. Crowell reviewed and considered the deposition of SGT's mother (Plaintiff Kohn), which included information regarding SGT's home life, discipline at home, and SGT's relationship with his parents.  Id.  Additionally, Plaintiffs point out Defendants' counsel cross-examined Dr. Crowell regarding other stressors during Dr. Crowell's deposition.  Id.  In terms of Dr. Crowell's methodology, Plaintiffs argue the Daubert standard permits psychologists to use their subjective perceptions and personal experience in forming their opinions.  Id. at 2.

Defendants' first challenge concerning the sufficiency of the information Dr. Crowell considered in forming her opinions is unconvincing.  Dr. Crowell's report and deposition testimony demonstrate she reviewed numerous documents to determine which stressors contributed to SGT's suicide.  In addition to depositions from school administrators, Dr. Crowell considered SGT's suicide note, SGT's suicide video, an interview with SGT's brother, and Plaintiff Kohn's deposition.  Doc. 82-1 at 5.  In her deposition, Dr. Crowell explained how she

identified various stressors and how the stressors factored into her analysis. Doc. 82-2 at 12. In her deposition, Dr. Crowell acknowledged she did not know all of the stressors that could have possibly contributed to SGT's suicide. When asked about the stressors Dr. Crowell was aware of, she stated "these stressors that I listed were ones that I identified as proximal to SGT's suicide." Id. When asked about stressors related to SGT's home life, Dr. Crowell stated "Well, all kids are disciplined at home. I didn't see anything from what I reviewed, that was outside of the normal range of typical parent/child discipline." Id. Dr. Crowell explained how a chain analysis focuses on events right before a suicide instead of long-term stressors, "Because most people contemplate suicide for only a few minutes before they act. And so even though a person may mull it over for years and years and years in some way, the actual decision to act is really short-term." Id. Dr. Crowell's report and testimony show that although she considered information about other stressors from outside of school, like SGT's home life and parental discipline, she determined those stressors were not "proximal stressors" on the day of SGT's suicide. Based on this record, I do not find that Defendants have shown Dr. Crowell's opinions are improperly based on insufficient information, such that Dr. Crowell's opinions should be excluded.

        Defendants second challenge regarding the reliability of Dr. Crowell's chain analysis methodology is also unconvincing. As noted above, Defendants argue Dr. Crowell's chain analysis "is not sufficiently reliable" because it is the "subjective opinion of the expert, unable to be tested, and with no known or potential rate of error associated with it." Doc. 82 at 3. Plaintiffs contend Dr. Crowell's methodology is based on her experience and meets the test for reliability.

For experience-based testimony, "the relevant reliability concerns may focus upon personal knowledge or experience." Kumho, 526 U.S. at 150; see also Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009) ("A district court may decide that nonscientific expert testimony is reliable based 'upon personal knowledge or experience.'") (quoting Kumho, 526 U.S. at 150).  When testimony is based on a social science, such as psychology, "professional study or personal experience" is a proper base for expert testimony. Maiz, 253 F.3d at 669; 325 Goodrich Ave., LLC v. Sw. Water Co., 891 F. Supp. 2d 1364, 1378 (M.D. Ga. 2012) (explaining the Daubert factors of testability, error rate, peer review and publication, and general acceptance are "generally inapplicable" to "non-scientific" testimony); Bryant v. BGHA, Inc., 9 F. Supp. 3d 1374, 1386 (M.D. Ga. 2014) (same).  Therefore, when an expert bases her opinions on experience, the expert must "explain how [her] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation omitted).  In other words, the expert must be able to demonstrate a sufficient connection between her experience and the opinions she offers.

Dr. Crowell has sufficiently explained the connection between her training and experience and her opinion that actions and inactions by staff at St. Marys Middle School likely increased SGT's vulnerability to mental health struggles and led to SGT's suicide.  Defendants have not shown Dr. Crowell's chain analysis is based on an unreliable methodology.

As noted above, Dr. Crowell has extensive experience both as a researcher and in a clinical setting.  Dr. Crowell has authored or co-authored numerous publications concerning risks of self-harm and suicide.  Dr. Crowell has also "overseen hundreds of clinical cases involving children, adolescents, and adults at high risk for suicide." Doc. 82-1 at 2.  Dr. Crowell explained

9

during her deposition that in her clinical practice she performs "a chain analysis" after a suicide or an instance of self-harm.  Doc. 82-2 at 12.  Dr. Crowell explained the chain analysis involves identifying a precipitating event (which she also described as the "proximal stressor(s)") and establishing the links in the chain to the resulting self-harm.  Id. at 12–13.  Dr. Crowell explained these links might include thoughts, emotions, biological responses, and behaviors.  Dr. Crowell explained the analysis requires consideration of all events and circumstances before the precipitating event that would have increased vulnerability.  Id.  Dr. Crowell explained this sort of chain analysis typically focuses on events within the day preceding the instance of self-harm because "most people contemplate suicide for only a few minutes before they act.  Id. at 13.  Dr. Crowell explained that this approach—focusing on proximal stressors rather than long-term stressors—is supported by relevant research about proximal risk for suicide.  Id. at 14.  Indeed, Dr. Crowell explained relevant research on individuals who attempted suicide shows the decision is impulsive.  Id. at 13.

      Dr. Crowell relied on her training and experience as a clinical and research psychologist when she performed a chain analysis in this case.  Dr. Crowell identified several documents she reviewed related to this case, including depositions, a forensic interview, and an academic article focused on youth suicide.  Doc. 82-1 at 2, 5.  After reviewing those materials, Dr. Crowell noted there was no evidence of any mental health support for SGT or any efforts to protect him from bullying.  Id. at 4.  Dr. Crowell identified the "ownership room" incident as a clear precipitating event for SGT's suicide, particularly because the "ownership room" probably had negative historical meaning for SGT.  Dr. Crowell noted the "ownership room" incident occurred in the context of ongoing academic struggles.  Id.  Dr. Crowell also explained how school attendance is known to associate with suicide risk and that bullying is a well-established risk factor for suicide,

and she relied on that information to inform her chain analysis in this case. Id. Ultimately, Dr. Crowell used her training and experience in psychology and self-harm—both in the clinical and research contexts—to perform a case-specific analysis in this case, which, in turn, informed her opinions about the causal chain leading to SGT's suicide. As non-scientific testimony, Dr. Crowell appropriately applied her experience and research to the facts in this case to formulate her opinions. See Does 1-4 v. Red Roof Inns, Inc., 688 F. Supp. 3d 1364, 1369 (N.D. Ga. 2023) ("Thus, in the context of a social science such as psychology, where experimental conditions and controls are not available, 'other indicia of reliability are considered under Daubert, including professional experience, education, training, and observations.'") (quoting Carrizosa v. Chiquita Brands Int'l, Inc., 47 F.4th 1278, 1318 (11th Cir. 2022)). In sum, Defendants have not shown Dr. Crowell's opinions are based on an unreliable methodology and this portion of Defendants' challenge fails.

## II. Dr. Crowell's Opinions Will Assist the Trier of Fact

Defendants argue causation is the "[t]he legal issue" in this case, and Dr. Crowell's opinions would not assist the trier of fact in resolving that issue. Doc. 82 at 3. Defendants contend Dr. Crowell's opinions focus only on what happened immediately before the suicide, not long-term stressors, and, therefore, her opinions will not help the jury determine whether and to what extent other events could have contributed to SGT's death.

Plaintiffs argue Dr. Crowell's opinions would assist a trier of fact because her opinions are related to the issue of contributing proximate cause. Doc. 86 at 2. Plaintiffs state Dr. Crowell's opinions relate to whether the school's actions or inactions caused or partially contributed to SGT's suicide. Id. Plaintiffs argue the jury is entitled to hear Dr. Crowell explain how experts have determined through research and clinical experience that the most relevant

11

time period for evaluating proximate cause of a suicide are the events of that particular day. Id. at 3. Plaintiffs argue this concept—that the day before a suicide is the most relevant time period for assessing causation—is outside the experience and frame of reference of most jurors and, therefore, Dr. Crowell's testimony will aid the jury in understanding this subject matter. Id.

Under Daubert, evidence is helpful (i.e., it will assist the trier of fact) if it "concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262–63. Expert testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys., 50 F.3d 908, 917 (11th Cir. 1995) (citations omitted).

Defendants' contention that Dr. Crowell's opinions will not assist the trier of fact is unconvincing. Dr. Crowell's opinions concern the relevant time period for assessing causal factors leading up to a suicide and self-harm generally, and, specifically, concern the proximal stressors that may have contributed to SGT's suicide. Dr. Crowell's opinions on these topics arise from her specialized training and experience in psychology and assessing risk of self-harm and suicide (with special focus on risks for adolescents). Dr. Crowell's opinions concern a core issue in this case—the cause of SGT's suicide—and the opinions concern topics likely beyond the understanding of the lay person. Therefore, Dr. Crowell's opinions would be helpful to the trier of fact. See, e.g., Jackson v. Catanzariti, No. 6:12-CV-113, 2019 WL 2098991, at *10 (S.D. Ga. May 14, 2019) (citing Frazier, 387 F.3d at 1262) (permitting expert testimony when the testimony is explaining something "beyond the understanding of the average lay person"). At most, Defendants' argument goes to the weight of Dr. Crowell's opinions, not admissibility.

Defendants' challenge is more appropriately the subject of cross-examination and not exclusion. In sum, Defendants have not shown Dr. Crowell's opinions would not assist the trier of fact.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Exclude Expert Testimony of Dr. Sheila Crowell. Doc. 82.

**SO ORDERED**, this 21st day of August, 2024.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA