IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| CAROL KOHN, mother and legal guardian of Sebastian Gonzalez Torres, and ESTATE OF SEBASTIAN GONZALEZ TORRES,<br><br>    Plaintiffs,<br><br>    v.<br><br>CAMDEN COUNTY SCHOOL DISTRICT, et al.,<br><br>    Defendants. | CIVIL ACTION NO.: 2:21-cv-108 |

**O R D E R**

Plaintiffs filed a Motion to Exclude Defendants' Expert.  Doc. 74.  Defendants filed a Response in opposition.  Doc. 83.  Plaintiffs filed a Reply.  Doc. 87.  For the following reasons, the Court **GRANTS** Plaintiffs' Motion to Exclude Defendants' Expert.  Doc. 74.

BACKGROUND

Plaintiffs assert various claims arising from the death of SGT, a minor and former student at St. Marys Middle School in the Camden County School District ("CCSD").  Doc. 54-1.  Plaintiffs allege SGT died of suicide because of multiple bullying incidents at the school and Defendants' failures to adequately respond to and address those incidents.  Plaintiffs assert claims under the Americans with Disabilities Act ("ADA") and Georgia law.

Defendants retained a public education expert, Dr. Stanley DeJarnett, to review Camden County School District and St. Marys Middle School's policies and procedures related to suicide prevention, bullying, Section 504 of the Rehabilitation Act, the Equal Educational Opportunity Act, and the English to Speakers of Other Languages ("ESOL") program.  Dr. DeJarnett

submitted an expert report summarizing his opinions. Doc. 74-1. Dr. DeJarnett was deposed on July 11, 2023. Doc. 74-2.

Dr. DeJarnett has a doctorate in educational leadership from the University of Georgia. Doc. 74-1 at 8. Dr. DeJarnett is the current Vice Chairperson of the Georgia State Board of Education, and prior to his appointment to the State Board of Education, he was an educator for 37 years in Georgia and Illinois. Id. at 1. This experience includes three and a half years as an elementary school principal, 10 years as an associate superintendent, and five years as a superintendent. Id. He was a classroom teacher at the high school and college level for 12 years. Id. He was also the curriculum director for the Georgia Department of Education and staff for the Georgia Governor's Honors Program for six and a half years. Id. Upon retiring from public education, Dr. DeJarnett was the director of an education consulting project, Georgia Vision Project for Public Education, for nine years. Id. As a member of the State Board of Education, Dr. DeJarnett states he is responsible for approving rules and regulations in compliance with federal and state law regarding bullying and other student safety issues. Id.

Dr. DeJarnett was asked to provide an expert opinion in this case on three subject areas: (1) whether CCSD's procedures and processes on suicide prevention were adequate and whether they met or exceeded those of other districts in Georgia; (2) whether CCSD staff were deliberately indifferent to claims of bullying by SGT and whether CCSD staff acted reasonably; and (3) whether CCSD followed Section 504 and ESOL procedures before the suicide. Id. at 2.

Regarding suicide prevention procedures and policies, Dr. DeJarnett opined the CCSD policy fully complied with the State Board rule and noted the Georgia School Boards Association provided guidance to Camden County Schools as they developed their local policy. Id. He opined CCSD exceeded the standards of care found in Georgia school systems because

CCSD went beyond the minimum local policy requirements and ensured certified and classified employees participated in suicide prevention training sessions.  Id.  He opined CCSD had as many structures and programs in place to support students with their mental health as other school districts in Georgia and more programs than the average school district with a similar size student population.  Id. at 3.  He noted CCSD implemented a program called "Sources of Strength" to reduce incidences of bullying as well as a suicide prevention program.  This program involved staff and students and the training created a support system of students who could recognize students in need and report to trained staff.  Id. at 2.  Trained staff members also served as "trusted adults" to students.  Id.  Dr. DeJarnett also noted the school system had other systems in place to support students in need, such as a suicide hotline, a student club called Students Against Destructive Decisions ("SADD"), and Mindset training.  Id. at 3.

Dr. DeJarnett also offered an opinion about CCSD's response to two instances of bullying involving SGT.  Id.  Dr. DeJarnett opined school staff acted professionally and appropriately when presented with actionable information.  Id.  Dr. DeJarnett stated only one of the two incidents was reported to school personnel.  Id.  Dr. DeJarnett opined CCSD acted upon the one reported incident, and, therefore, was not deliberately indifferent to the incident.  Id.  Dr. DeJarnett also disagreed with Plaintiff's expert, opining staff at St. Marys Middle School did not bully, harass, or discriminate against SGT and his family.  Id.

For Section 504 and ESOL procedures, Dr. DeJarnett opined there is no evidence the school district was willfully indifferent to SGT's academic, behavioral, or safety needs.  Id. at 5.  Dr. DeJarnett stated a medical diagnosis of an illness or impairment does not automatically mean a student can receive services under Section 504.  Id.  He also stated the evidence does not support the claim SGT was discriminated against because of his ethnicity because the

proportionality of discipline referrals was within normal limits.  Id.  Dr. DeJarnett opined CCSD followed appropriate ESOL procedures in exiting SGT from the ESOL program and placing him on monitoring status following his exit.  Id.

Plaintiffs move to exclude Dr. DeJarnett's opinions, arguing although Dr. DeJarnett is qualified generally in public education, he is not qualified in the subjects for which he offers his opinions.  Doc. 74.  Plaintiffs also argue Dr. DeJarnett's opinions are not based on a reliable methodology.

## LEGAL STANDARD

The United States Supreme Court's holding in Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993), and the text of Rule 702 require trial judges to serve as gatekeepers in determining the admissibility of expert testimony; however, any decision regarding admissibility is not a position on the strength or weight of the testimony.  Fed. R. Evid. 702; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).  In this Circuit, courts routinely look to three elements to determine if expert testimony is admissible under Daubert and Rule 702.  As the Eleventh Circuit Court of Appeals has stated, the elements for consideration are whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citations omitted).  "[A]lthough there is some overlap among the inquiries into an expert's qualifications, the reliability of his proffered opinion and the helpfulness of that opinion, these are distinct concepts that courts and litigants must take care not to conflate."  Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326

F.3d 1333, 1341 (11th Cir. 2003). The trial court has broad latitude in evaluating each of these three factors.

As to qualifications, an expert may be qualified "by knowledge, skill, training, or education." Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1193 (11th Cir. 2010). The expert need not have experience precisely mirroring the case at bar in order to be qualified. Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001). However, where an expert does have experience directly applicable to an issue at bar, experience alone may provide a sufficient foundation for expert testimony. Frazier, 387 F.3d at 1261.

As to reliability, courts look, when possible, to: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Daubert, 509 U.S. at 593–94. However, these factors are not exhaustive, and "a federal court should consider any additional factors that may advance its Rule 702 analysis." Quiet Tech., 326 F.3d at 1341. At all times in this flexible inquiry, the court's focus must be "solely on principles and methodology, not on the conclusions that they generate." Seamon v. Remington Arms Co., LLC, 813 F.3d 983, 988 (11th Cir. 2016) (citation omitted).

Finally, as to the third element, expert testimony is likely to assist the trier of fact to the extent "it concerns matters beyond the understanding of the average lay person and logically advances a material aspect of the proponent's case." Kennedy v. Elec. Ins. Co., Case No. 4:18-cv-148, 2019 WL 2090776, at *5 (S.D. Ga. May 13, 2019) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 591 (1993)); Frazier, 387 F.3d at 1262–63. Rule 702 permits experts to make conclusions based on competing versions of the facts, but those conclusions must still

assist the trier of fact by explaining something that is "beyond the understanding of the average lay person." Jackson v. Catanzariti, No. 6:12-CV-113, 2019 WL 2098991, at *10 (S.D. Ga. May 14, 2019) (citing United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004)). Expert testimony generally will not help the trier of fact "when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. (quoting Cook v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1111 (11th Cir. 2005)). Such testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys., 50 F.3d 908, 917 (11th Cir. 1995) (citations omitted).

"The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999); McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002). However, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of proffered evidence." Quiet Tech., 326 F.3d at 1341. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

## DISCUSSION

Plaintiffs argue Dr. DeJarnett is not qualified to opine on the specific subjects of bullying, suicide and self-harm prevention, Section 504 of the Rehabilitation Act, and the Equal Educational Opportunities Act. Doc. 74 at 7–9. Plaintiffs also argue Dr. DeJarnett's opinions are not based on a reliable methodology because they are based on incomplete information and a misunderstanding of deposition testimony. Id. at 9–12.

I.     **Dr. DeJarnett Lacks the Qualifications to Offer Expert Opinions on Bullying, Suicide and Self-Harm Prevention, Section 504 of the Rehabilitation Act, or the Equal Educational Opportunities Act**

Plaintiffs argue Dr. DeJarnett is not qualified to opine on bullying, suicide and self-harm prevention, the Rehabilitation Act, or the Equal Educational Opportunities Act because he lacks specialized training, experience, or education in these specific contexts.  Id.  Doc. 74 at 5–9.  Plaintiffs argue Dr. DeJarnett has never directly worked with the Rehabilitation Act and Equal Educational Opportunity Act, and he has very little experience with anti-bullying training, threats of self-harm, or responding to bullying incidents.  Id. at 7–9.  Plaintiffs cite Dr. DeJarnett's deposition testimony to demonstrate his lack of adequate qualifications.

Defendants disagree, arguing Dr. DeJarnett has "as much experience and knowledge as most anyone in the state of Georgia when it comes to insight and oversight of any aspect of public education."  Doc. 83 at 2.  Defendants argue Dr. DeJarnett's opinions relate to CCSD's compliance with federal regulations and programs and his lack of previous experience or training has no bearing on his opinions.  Id. at 4.

Under Rule 702, an individual may be qualified to offer expert opinions based on that individual's knowledge, skill, experience, training, or education.  Frazier, 387 F.3d at 1260–61.  "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'"  Clena Invs., Inc. v. XL Specialty Ins. Co., 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting Jack v. Glaxo Wellcome, Inc., 239 F. Supp. 2d 1308, 1314–16 (N.D. Ga. 2002)).  "This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility."  Id.

Although the qualifications inquiry is not a stringent one, I find Dr. DeJarnett is not qualified in the areas for which he seeks to offer expert opinions.  Dr. DeJarnett has no direct

7

experience working with the Equal Educational Opportunities Act. When asked about the Equal Educational Opportunities Act in his deposition, he stated: "[T]hat was not a part of my teaching and learning responsibilities. I delegated the oversight of that to other - - or collaborated with other people in the department." Doc. 74-2 at 32. When asked about specific types of ESOL testing, Dr. DeJarnett testified he never administered a test, did not know what they were used for, and did not know how often they were administered. Id. at 133. Dr. DeJarnett was also not familiar with the forms created for students who are engaged in and exit the ESOL program. Id. at 134. Dr. DeJarnett has no personal experience dealing with several aspects of the Equal Educational Opportunities Act, especially as it relates to ESOL services. Defendants have not pointed to any other basis for Dr. DeJarnett to offer expert opinions on the Equal Educational Opportunities Act or ESOL programs. Defendants simply have not shown Dr. DeJarnett is qualified to opine on the Equal Educational Opportunities Act and CCSD's compliance with the ESOL program. Therefore, Dr. DeJarnett cannot offer expert opinions on the Equal Education Opportunities Act or CCSD's compliance with the requirements of the ESOL program.

Dr. DeJarnett also has no direct experience working with Section 504 of the Rehabilitation Act. Dr. DeJarnett admits in his own testimony he does not have any experience working directly with Section 504 because it was primarily the responsibility of the special education director. Id. at 30. When asked how often a report of bullying resulted in a 504 plan, Dr. DeJarnett could not answer the question. Id. at 107. Defendants argue Plaintiffs are focusing on minutiae from the deposition and the citied testimony is not relevant to determining whether CCSD complied with Section 504. Doc. 83 at 4. However, Defendants do not point to any relevant experience, education, or training qualifying Dr. DeJarnett to opine on Section 504 compliance. Relying on Dr. DeJarnett's history as a public educator generally is insufficient

8

when he admits he lacks any experience with this particular topic.  Defendants have not shown Dr. DeJarnett is qualified to opine on Section 504 of the Rehabilitation Act, particularly as it relates to the specific events of this case.

Similarly, Dr. DeJarnett has little to no experience with bullying claims or anti-bullying training, and he has no identifiable specialized training or education in this area.  Dr. DeJarnett stated he never personally offered any anti-bullying training to educators or administrators.  Doc. 74-2 at 33.  Dr. DeJarnett stated he had very few instances of dealing with bullying incidents as a teacher or administrator.  Id. at 36.  In his current role as a State Board of Education member, Dr. DeJarnett states he is responsible for approving rules and regulations to comply with federal and state law regarding bullying and other student safety issues.  Doc. 74-1 at 1.  However, Dr. DeJarnett's opinions related to bullying concern whether CCSD was deliberately indifferent to specific bullying incidents, not whether CCSD's rules and regulations complied with federal and state law.  Dr. DeJarnett's opinions do not appear to be connected to, or based on, his experience as a member of the State Board of Education.  Ultimately, Defendants have not shown Dr. DeJarnett is qualified to opine on bullying claims, anti-bully training, or CCSD's responses to bullying claims.

Dr. DeJarnett also has little to no experience with suicide prevention programs or incidents of self-harm.  Dr. DeJarnett testified he had one previous experience working with students who threatened self-harm.  However, he stated he was not directly involved with counseling any student who threatened self-harm.  Dr. DeJarnett's only role was to talk to other students in the program to make sure the students felt supported.  Doc. 74-2 at 41–42.  Defendants provide no explanation of how Dr. DeJarnett is qualified to offer expert opinions on the topic of suicide prevention programs or specific incidents of self-harm, aside from

9

referencing Dr. DeJarnett's 37 years as a public educator. Nothing in Dr. DeJarnett's resume or deposition testimony demonstrates he has any specialized training, experience, or knowledge that would qualify him to offer expert opinions on suicide prevention programs or specific incidents of self-harm. Ultimately, Defendants have not shown Dr. DeJarnett is qualified to opine on these topics.

Overall, Dr. DeJarnett has little to no direct training, education, experience, or specialized knowledge in any of the areas in which he intends to offer expert opinions. Defendants have not shown Dr. DeJarnett's general experience in public education would render him qualified to opine on these topics. Because Defendants have not shown Dr. DeJarnett is qualified to offer expert opinions on these topics, Dr. DeJarnett shall not be permitted to offer these opinions at trial.

## II. Dr. DeJarnett's Opinions Are Not Based on a Reliable Methodology

Plaintiffs argue Dr. DeJarnett's opinions relating to suicide prevention and bullying are based on an unreliable methodology and should be excluded. Plaintiffs argue Dr. DeJarnett does not explain how his experience and training give him the expertise to provide opinions on these topics. Doc. 74 at 9. Plaintiffs also argue Dr. DeJarnett's opinions are based on incomplete and inaccurate information. Id. Plaintiffs make targeted challenges to the reliability of Dr. DeJarnett's methodology for his opinions on the adequacy of CCSD's suicide prevention policies and on whether CCSD was deliberately indifferent to bullying incidents involving SGT.

Although Defendants generally oppose Plaintiffs' Motion, Defendants do not respond to Plaintiffs' reliability arguments. Indeed, in their short response, Defendants do not discuss reliability or methodology, and Defendants do not explain how Dr. DeJarnett connected his opinions to his specific experience. Doc. 83. Defendants do, however, attempt to counter

Plaintiffs' arguments about whether the information Dr. DeJarnett relied on was incomplete or inaccurate.  Id. at 3.  For example, Defendants argue Dr. DeJarnett understood the underpinnings of CCSD's suicide prevention policies and programs—including the Sources of Strength policy—even if he did not personally review the policies.  Id.  Defendants also argue the individual CCSD suicide prevention policies and programs—including the suicide hotline, SADD club, and Mindset training—did not factor into Dr. DeJarnett's opinion, and Dr. DeJarnett testified his opinion would be the same even without considering those three items.  Id.

Trial judges are given considerable flexibility in what factors to consider when determining whether expert testimony is reliable.  Frazier, 387 F.3d at 1262.  When testimony is based on a social science, "professional study or personal experience" is a proper base for expert testimony.  Maiz, 253 F.3d at 669; 325 Goodrich Ave., LLC v. Sw. Water Co., 891 F. Supp. 2d 1364, 1378 (M.D. Ga. 2012) (explaining the Daubert factors of testability, error rate, peer review and publication, and general acceptance are "generally inapplicable" to "non-scientific" testimony); Bryant v. BGHA, Inc., 9 F. Supp. 3d 1374, 1386 (M.D. Ga. 2014) (explaining same).  For experience-based testimony, "the relevant reliability concerns may focus upon personal knowledge or experience."  Kumho, 526 U.S. at 150; see also Am. Gen Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009) ("A district court may decide that nonscientific expert testimony is reliable based 'upon personal knowledge or experience.'") (quoting Kumho, 526 U.S. at 150).  In order for the opinion to be deemed reliable, the expert must "explain how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation omitted).  In other words, for the expert's opinions to be admissible,

he must be able to demonstrate a sufficient connection between his experience and the opinion he offers.

### A.     CCSD Suicide Prevention Policies and Programs

Dr. DeJarnett opined CCSD suicide prevention policies and programs fully complied with the State Board rule, and CCSD exceeded the standards of care found in Georgia school systems.  Doc.74-1 at 2–3.  Dr. DeJarnett based his opinions on the CCSD's use of four suicide prevention resources at St. Marys Middle School: Sources of Strength training; the suicide hotline; the Students Against Destructive Decisions ("SADD") club; and Mindset training.  Id.

Plaintiffs argue Dr. DeJarnett's opinions are not based on reliable methodology, and Dr. DeJarnett did not connect his opinions to his training, experience, or education.  Doc. 74.  Plaintiffs also argue Dr. DeJarnett's opinions are based on incomplete and inaccurate information.  Plaintiffs point out Dr. DeJarnett did not read the primary source material for the Sources of Strength training or the Mindset training and had no prior knowledge of either program.  Id. at 10–11.  Similarly, Plaintiffs point out Dr. DeJarnett could not explain how St. Marys Middle School advertised the suicide hotline to its students, and he had no idea whether SGT would have been made aware of that resource.  Id. at 11.  Plaintiffs also point out Dr. DeJarnett based his opinions, in part, on the presence of a SADD club, but there is no evidence a SADD club even existed at St. Marys Middle School.  Id.

Defendants have not shown Dr. DeJarnett's opinions on the adequacy of CCSD's suicide prevention policies are based on a reliable methodology.  Dr. DeJarnett did not identify any specific education or training that would serve as the basis for his expert opinions in these areas.  Furthermore, Defendants and Dr. DeJarnett have failed to show Dr. DeJarnett's experience as a public educator, generally, would provide an adequate basis for these expert opinions.  Indeed,

12

Dr. DeJarnett had only limited experience with students threatening self-harm and he did not directly manage any incidents. Ultimately, Defendants and Dr. DeJarnett have failed to show an adequate connection between the specific opinions offered on suicide prevention policies and his experience as an educator. Further scrutiny of Dr. DeJarnett's opinions and deposition testimony highlights the unreliability of his methodology.

In his expert report, Dr. DeJarnett opined CCSD's suicide prevention policies exceeded the standard of care for Georgia school systems at least in part because CCSD ensured "certificated and classified" employees participated in suicide prevention training programs. Doc. 74-1 at 2. But Dr. DeJarnett fails to explain how he reached this conclusion. Dr. DeJarnett does not explain the standard of care for Georgia school systems, how he determined that standard, what the minimum requirements are for suicide prevention training programs, or—most importantly—how his experience in public education would allow him to form such expert opinions.

In support of his overarching opinion, Dr. DeJarnett opined CCSD had as many mental health programs in place as other school districts in Georgia and "more than the average school district with this size student population." Id. at 3. Dr. DeJarnett based this opinion largely—if not exclusively—on the existence of the Sources of Strength program, a suicide hotline, a SADD club, and Mindset training. Id. at 2–3. However, Dr. DeJarnett's deposition testimony makes it clear he had little to no understanding of these programs. Dr. DeJarnett had no prior knowledge of the Sources of Strength program, and all his knowledge of the program was gleaned from reviewing depositions of other witnesses in this case. Doc. 74-2 at 51. Dr. DeJarnett did not review any documents describing or establishing the Sources of Strength program. Regarding the suicide hotline, Dr. DeJarnett did not know how or if the suicide hotline was advertised to

13

students at St. Marys Middle School.  Id. at 58.  Regarding the SADD club, Dr. DeJarnett was unaware that a SADD club did not exist at St. Marys Middle School, until he was confronted with that information at his deposition.  Id. at 59.  Dr. DeJarnett explained he had little to no understanding of the Mindset training, even though it served as the foundation of his opinion.  Id. at 61.  In fact, after reviewing a Mindset training document during his deposition, Dr. DeJarnett stated, "I don't know that that would be relevant in this particular case . . . I have no degrees in special education."  Id. at 63.

Dr. DeJarnett opined CCSD had adequate—indeed, exceptional—suicide prevention policies and programs, but Dr. DeJarnett did not explain how his knowledge, personal experience, or training would support that opinion.  Dr. DeJarnett's deposition testimony shows his minimal understanding of the CCSD programs was inaccurate and incomplete.  Dr. DeJarnett also lacks any experience in suicide prevention policies or programs that would inform his opinions on the relevant standard of care in Georgia schools.  Ultimately, Defendants and Dr. DeJarnett have failed to show how Dr. DeJarnett's experience led to the conclusions he reached, why his experience would provide a sufficient basis for his opinions, or how his experience was reliably applied to the facts.  In other words, Defendants and Dr. DeJarnett failed to demonstrate Dr. DeJarnett's opinions about CCSD's suicide prevention programs are based on any reliable methodology.

### B.     CCSD's Response to Bullying Incidents Involving SGT

Dr. DeJarnett also offered an opinion about CCSD's response to two instances of bullying involving SGT.  Doc. 74-1 at 3.  Dr. DeJarnett opined school staff acted professionally and appropriately when presented with actionable information.  Dr. DeJarnett stated only one of the two incidents was reported to school personnel.  Dr. DeJarnett opined CCSD acted upon the

one reported incident, and, therefore, was not deliberately indifferent to the incident. Dr. DeJarnett also disagreed with Plaintiff's expert, opining staff at St. Marys Middle School did not bully, harass, or discriminate against SGT and his family.

Dr. DeJarnett does not explain how his experience as a public educator is related to his opinions on CCSD's response to bullying incidents involving SGT. In his expert report, Dr. DeJarnett merely summarized the evidence he reviewed and concluded—without any explanation—the CCSD staff "acted professionally and appropriately" and CCSD was not deliberately indifferent. Doc. 74-1 at 3. At no point in his report or deposition does Dr. DeJarnett explain how he applied his own experience as a public educator (or any specialized training or education) to the evidence in this case. Dr. DeJarnett does not explain how he or another school administrator should have responded to these bullying claims. Dr. DeJarnett also does not explain what constituted deliberate indifference in this context and how the school's response met that threshold. Notably, Dr. DeJarnett's deposition testimony demonstrates he has very little experience managing bullying incidents or administering anti-bullying training. Ultimately, Dr. DeJarnett's opinions on the school's response to bullying incidents involving SGT are mere *ipse dixit*. See Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1111 (11th Cir. 2005) ("Moreover, 'nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.") (quoting Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 921 (11th Cir. 1998).

Defendants have failed to explain how Dr. DeJarnett's experience in public education led to the conclusions he reached, why that experience is a sufficient basis for his opinions, and how that experience is reliably applied to the facts of this case. Therefore, Defendants have failed to

demonstrate Dr. DeJarnett's opinions about CCSD's responses to bullying incidents involving SGT are based on any reliable methodology.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion to Exclude Defendants' Expert.  Doc. 74.

**SO ORDERED**, this 28th day of August, 2024.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA