# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

CAROL KOHN, mother and legal
guardian of SGT, minor, and
ESTATE of SGT,

    Plaintiffs,

    v.

CAMDEN COUNTY SCHOOL DISTRICT,
DANIEL BURNS, in his
individual capacity, GAIL
DUGGER, in her individual
capacity, and KATHRYN JACKSON,
in her individual capacity,

    Defendants.

2:21-cv-108

## ORDER

Before the Court is Defendants' motion for summary judgment. Dkt. No. 146. The motion has been thoroughly briefed and is ripe for review. Dkt. Nos. 146, 158, 159, 166, 167. For the reasons stated below, Defendants' motion is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This case arises from a middle school student's suicide. Dkt. No. 54. Plaintiffs allege that the Camden County School District ("the School District") violated the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA" or "Section 504"), and

the Equal Educational Opportunities Act ("EEOA"), contributing to the student's decision to take his own life. Id. Plaintiffs also bring state law negligence claims against three individual School District employees. Id.

## I.    SGT's Sixth-Grade Year

In September 2017, SGT, a minor child and sixth grader, started school at St. Mary's Middle School in Camden County, Georgia. Dkt. No. 159 ¶ 5. SGT was born in Puerto Rico and spoke Spanish as his first language. Id. ¶ 1, Dkt. No. 54 ¶ 144. Accordingly, upon his enrollment, the School District enrolled SGT in the English to Speakers of Other Languages ("ESOL") program. Dkt. No. 159 ¶ 7.

In January 2018, SGT's mother, Plaintiff Carol Kohn, became concerned about SGT's incomplete schoolwork and classroom behavior. Dkt. No. 146-7 at 98. She brought SGT to a psychiatrist, and he was diagnosed with Attention-Deficit/Hyperactivity Disorder ("ADHD"). Id.; Dkt. No. 159 ¶ 8. The psychiatrist prescribed SGT Adderall. Dkt. No. 159 ¶ 9. On February 6, 2018, Plaintiff Kohn informed the School District of SGT's diagnosis and his Adderall treatment. Dkt. No. 146-7 at 98.

SGT took two language proficiency exams during his sixth-grade year. Dkt. No. 146-11 at 45. On May 16, 2018, his ESOL teacher wrote that, "[SGT] has shown tremendous growth this year" and found that SGT's test scores met the Georgia state standards

for exiting the ESOL program. Id. Also, at some point during May 2018, Plaintiff Kohn consulted with SGT's doctor to stop medicating SGT for ADHD. Dkt. No. 159 ¶ 11.

## II. SGT's Seventh-Grade Year

The following school year, SGT continued to take a reading class with the ESOL teacher.[1] Id. ¶ 20. SGT also participated in the ESOL teacher's after-school program. Dkt. No. 146-11 at 4, 12:17–21.

During this school year, SGT said something to his ESOL teacher that made her think SGT wanted to harm himself. Id. at 7, 22:21–23:16. The ESOL teacher immediately brought SGT to the guidance counselor, Defendant Daniel Burns. Id. at 7, 23:17–19. The ESOL teacher does not remember SGT's exact words and does not recall what date this occurred. Id.

On December 4, 2018, SGT made another concerning statement, threatening to kill himself in front of a friend in his Language Arts class. Dkt. No. 159 ¶ 23. After SGT's friend reported this, SGT's Language Arts teacher also referred SGT to Defendant Burns. Id. ¶ 22.[2] Defendant Burns conducted a suicide risk screening

---

[1] After testing out of ESOL services, students are "monitored" for the following two school years. Dkt. No. 159 ¶ 9.

[2] Defendant Burns purports that the ESOL teacher brought SGT to him later that same day, December 4, 2018. Dkt. No. 146-3 ¶¶ 2–3. Plaintiffs dispute this, arguing this sequence of events is impossible because the ESOL teacher testified that she brought SGT to Defendant Burns's office in the morning, and SGT's Language Arts class was SGT's last class of the day. Dkt. No. 59 at 7.

assessment and called Plaintiff Kohn to the school. Id. ¶¶ 32, 36.
The suicide risk assessment determined that SGT was at least a
level five of six; this indicates that SGT had thoughts of suicide,
partially formulated a plan to end his life, and had some intent
to do so. Id. ¶ 33. SGT refused to answer the screening questions
for level six. Id. ¶ 34. Plaintiff Kohn took SGT to see his
pediatrician the following day. Id. ¶ 43. At the appointment, the
pediatrician wrote an Adderall prescription for SGT, but Plaintiff
Kohn did not fill it. Id. ¶ 48, Dkt. No. 146-7 at 117.

Between January 2019 and the end of seventh grade, Plaintiff
Kohn "did not have any concern that SGT might commit suicide."
Dkt. No. 159 ¶ 52. On May 10, 2019, each of SGT's teachers reported
that he had a passing grade. Dkt. No. 146-11 at 44. SGT's ESOL
teacher determined he would continue as a "monitored" student in
the ESOL program for the next school year. Id. Plaintiff Kohn
continued to have concerns about SGT focusing and completing his
schoolwork as he finished seventh grade. Id.

### III. SGT's Eighth-Grade Year

SGT struggled in eighth grade; in October 2019, Plaintiff
Kohn found SGT crying in his room. Dkt. No. 159 ¶ 59. SGT confided
in his mother that he was being bullied. Id. ¶¶ 60-61. SGT told
her that these bullies threw balls at his head in gym class, kicked
SGT in the back of the knee in the hallway to try to make him fall,
and called SGT names implying that he was homosexual. Id.

On October 28, 2019, Plaintiff Kohn reported the bullying to Defendant Burns. Id. ¶ 62. Shortly thereafter, Defendant Burns spoke with SGT at school and scheduled a parent-teacher conference with Plaintiff Kohn. Id. ¶¶ 67-68. Plaintiff Kohn also asked that SGT be moved out of the gym class. Id. ¶ 65.

Defendants purport that the School District addressed the bullying by interviewing SGT, but SGT did not "identify any individual" who threw the balls at him or kicked him, "nor could he identify any particular date or time in which it occurred." Dkt. No. 167 at 4. On November 6, 2019, Defendant Burns held the parent-teacher conference with Plaintiff Kohn, during which she reiterated her concerns about the bullying and requested a 504 Plan.[3] Dkt. No. 146-3 ¶¶ 9, 11. Defendants posit that "the school was unable to address the claims of bullying with any known perpetrators," so Defendant Burns "spoke to school administration about moving [SGT] out of the gym class to separate him from the bullying." Id. ¶ 8. After the conference, Defendants claim that "[SGT] was moved out of the gym class and into a Business and

---

[3] A 504 Plan refers to Section 504 of the RA. 29 U.S.C. § 794(a). Federally funded programs, such as school districts, evaluate students with disabilities and formulate 504 Plans "designed to aid the student's access to the general curriculum." Durbrow v. Cobb Cnty. Sch. Dist., 887 F.3d 1182, 1186 (11th Cir. 2018) (citing 34 C.F.R. § 104.33).

Computer Science class." Id. ¶ 9.[4] Meanwhile, Plaintiffs maintain that SGT was not transferred out of the gym class; they support this with the sworn testimony of SGT's classmate. Dkt. Nos. 158-1, 158-8. There are no records of a class transfer. Dkt. No. 159 ¶ 78.

On November 14, 2019, Plaintiff Kohn returned the 504 Plan Request Form. Id. ¶ 86. On Monday, November 18, 2019, SGT got in trouble in math class and was sent to a separate room to "cool down." Dkt. Nos. 158 at 7, 159 ¶¶ 86–95. "On the way home from school that afternoon, SGT told his brother that he had gotten in trouble for something he did not do." Dkt. No. 159 ¶ 96. After writing a note and recording a video for his mother, SGT hung himself in his home. Id. ¶¶ 100-04. SGT passed away the following morning; he was fourteen years old. Id. ¶ 102.

**IV.  Plaintiffs' Present Suit**

Plaintiff Kohn, as the mother and legal guardian of SGT, and the estate of SGT filed this action against the School District and three Individual Defendants on November 17, 2021. Dkt. No. 1. The Individual Defendants were employees of St. Mary's Middle School at the time of SGT's death and include (1) Gail Dugger, the eighth-grade assistant principal, (2) Daniel Burns, SGT's guidance

---

[4] This Business and Computer Science class is also called the technology or tech class throughout the record. See, e.g., Dkt. No. 146-8 at 13.

counselor, and (3) Kathryn Jackson, SGT's eighth-grade math teacher. Dkt. Nos. 146-8 at 3, 146-9 at 9, 146-12 at 3-4.

In the second amended complaint, Plaintiffs allege all Defendants violated the ADA and RA by failing to address the bullying and failing to accommodate SGT's ADHD. Dkt. Nos. 54 ¶¶ 115-38, 158. Plaintiffs further allege that the School District violated the EEOA by prematurely transitioning SGT out of the ESOL program. Dkt. No. 54 ¶¶ 139-63.[5] Finally, Plaintiffs allege that Defendants Dugger, Burns, and Jackson acted negligently, contributing, in part, to SGT's suicide. Id. ¶¶ 164-82. Plaintiffs seek damages for SGT's medical expenses, funeral expenses, lost wages, and Plaintiff Kohn's lost intangibles. Id. ¶¶ 191-200. Defendants now move for summary judgment. Dkt. No. 146.[6]

## LEGAL STANDARD

The Court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party

---

[5] Plaintiffs also reference "Title VI" in this section of the complaint, dkt. no. 54 at 22, and the Court assumes Plaintiffs are referring to Title VI of the Civil Rights Act of 1964. Because Plaintiffs make no argument in response to the motion for summary judgment on this claim, however, it is deemed abandoned. See Dkt. No. 158; Resolution Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

[6] Defendants previously moved for summary judgment. Dkt. No. 80. The Court denied the motion for summary judgment without prejudice and reopened discovery to allow Plaintiffs to depose the Business and Computer Science teacher. Dkt. Nos. 98, 100.

seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252. Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in its pleadings." Walker v. Darby, 911 F.2d 1573, 1576 (11th Cir. 1990). "Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial." Id. at 1576–77.

The Court views the record evidence "in the light most favorable to the [nonmovant]," Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will draw all justifiable inferences in the nonmovant's favor, Anderson, 477

U.S. at 255. At this stage, "a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1253 (11th Cir. 2013).

## DISCUSSION

### I.   ADA & RA Claims Against All Defendants

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability . . . be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504(a) of the RA mandates that "[n]o otherwise qualified individual with a disability in the United States . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). This Court "'relies on cases construing the [RA] and the [ADA] interchangeably' because 'the same standards govern discrimination claims' under both statutes." T.W. v. Seminole Cnty. Sch. Bd., 610 F.3d 588, 604 (11th Cir. 2010) (quoting Allmond v. Akal Sec., Inc., 558 F.3d 1312, 1316 n.3 (11th Cir. 2009) (alterations adopted)). Plaintiffs bring

a disability-based harassment claim under the ADA and the RA against all Defendants. Dkt. No. 54 ¶ 116.

**A. ADA & RA Claims Against Individual Defendants**

As a preliminary matter, Defendants argue that there is no individual capacity liability under the ADA or RA. Dkt. No. 146-2 at 11 (citing Badillo v. Thorpe, 158 F. App'x 208, 211 (11th Cir. 2005)). In other words, Defendants Burns, Dugger, and Jackson argue that they cannot be sued individually, so Plaintiffs' ADA and RA claims against them must fail.

Plaintiffs explicitly abandon their RA claims against the Individual Defendants. Dkt. No. 158-2 at 1, n.2. As for the ADA claims, Plaintiffs do not similarly concede that those claims are abandoned but title the pertinent section in their brief opposing summary judgment, "The Americans with Disabilities Act and Section 504 Claim Against the *District*." Dkt. No. 158 at 19 (emphasis added). Regardless, it is settled that neither the ADA nor RA provide for personal liability of defendants sued in their individual capacities. E.g., Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996) (ADA case); Badillo, 158 F. App'x at 211 (RA and ADA case). Thus, the Court **GRANTS** summary judgment to Defendants Burns, Dugger, and Jackson as to all ADA and RA claims.

## B. ADA & RA Disability Harassment Claim Against the School District

The Court now moves to the ADA and RA harassment claim against the School District. The parties agree that this case is governed by the standard from the Title IX case, Davis v. Monroe County Board of Education, 526 U.S. 629 (1999). Dkt. Nos. 146-2, 148. Under Davis, there are five elements to "peer-on-peer disability harassment claims under the ADA" and RA:

> (1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment.

Moore v. Chilton Cnty. Bd. of Educ., 1 F. Supp. 3d 1281, 1292 (M.D. Ala. 2014). Although the Eleventh Circuit has never explicitly adopted this test, in Long v. Murray County School District, the circuit court affirmed the district court's application of this five-element test because "both parties effectively agree that the deliberate indifference standard set forth in Davis . . . should apply to the § 504 and ADA claims." 522 F. App'x 576, 577 n.1 (11th Cir. 2013); see also S.S. v. E. Ky. Univ., 532 F.3d 445, 453 (6th Cir. 2008) (The Davis standard "has been applied to disability-based peer-on-peer harassment claims brought under the ADA and § 504 by the majority of federal district courts to have addressed the issue.") Just as in Long, the parties in this case agree that

11

the five-element test from Davis applies. Following the Eleventh
Circuit, the Court applies the Davis standard to the claim of
disability-based harassment here.[7]

For the purposes of summary judgment, Defendants "assume that
[SGT] is an individual with a disability based on his ADHD
diagnosis," so the first Davis element is satisfied. Dkt. No. 146-
2 at 14. Thus, the Court's analysis focuses on the second through
fifth elements.

### i. Second Davis Element: There Are Factual Disputes Concerning Whether There Was Harassment Based on SGT's Disability.

Peer-on-peer harassment is based upon a student's disability
when the student's peers taunted him or her for the student's
characteristics attributable to that disability. See Moore, 1 F.
Supp. 3d at 1297 (considering that "on a daily basis multiple
students hurled insults at [the student] based upon her
weight . . . and her limp" caused by her disability); Long v.
Murray Cnty. Sch. Dist., No. 10-CV-00015, 2012 WL 2277836, at *26
(N.D. Ga. May 21, 2012) (holding the evidence sufficient to create
a genuine issue of fact on this element where peers of a student
with Asperger's Syndrome "picked on" him because he was "different"
and "a little slow").

---

[7] Defendants assume that the Title IX peer-on-peer sexual
harassment standard applies *only* for the purposes of the motion
for summary judgment. Dkt. No. 146-2 at 12.

Defendants do not dispute that SGT felt bullied at school. Dkt. No. 159 ¶¶ 59–61. Rather, Defendants argue that there is no evidence that SGT's classmates mistreated him because of his disability. Dkt. No. 146-2 at 15. Plaintiffs respond that it is enough that SGT's peers bullied him because of behaviors related to his ADHD. Dkt. No. 158 at 20–21 (quoting U.S. Dep't of Educ, Off. Civ. Rights, Dear Colleague Letter: Responding to Bullying of Students with Disabilities (Oct. 21, 2014), https://www.ed.gov/ sites/ed/files/about/offices/list/ocr/letters/colleague-bullying -201410.pdf). Plaintiffs cite a Department of Education Dear Colleague letter to demonstrate how disability-based harassment is more nuanced when the child's disability is invisible and inextricably linked with his or her demeanor, like ADHD or autism. See id. (explaining that taunting a student with ADHD and a speech disability by "calling him names such as 'weirdo' and 'gay,'" would constitute disability harassment in an OCR enforcement action).

Plaintiff Kohn testified that she "know[s] that [SGT] has been bullied because of his ADHD." Dkt. No. 146-7 at 32, 125:7. She explained that SGT's talkative and attention-drawing behavior in class, stemming from his ADHD, resulted in his classmates making fun of him. Id. at 32–33, 125:10–126:14. Defendant Jackson testified that some of SGT's behaviors in class suggested that he had ADHD. Dkt. No. 146-9 at 6, 18:5–14. In SGT's suicide note, he wrote:

> I [am] always being bullied at this middle school. The
> main reason why is because I'm weird. I like girls but
> I act gay at school, in school, people call me "gay boy"
> or "faggot boy" and it really hurts me.

Dkt. No. 146-7 at 137. In the video recorded before he committed suicide, SGT closed by saying, "I feel lonely every day and I just can't. Being called names at schools, just can't. Bye mom, I love you." Dkt. No. 159 ¶ 103. Plaintiffs further submit an expert report, which concludes "there was a high likelihood that the bullying and disability were linked" because of the "context" in which SGT was bullied. Dkt. No. 158-7 at 6. From these facts, a reasonable jury could connect the name-calling and physical harassment to the bullies' perception of SGT's demeanor and ADHD-related behaviors in school. Viewing the facts in the light most favorable to Plaintiffs, the Court finds that there is a genuine dispute over whether SGT was bullied due to his ADHD-related behaviors. Accordingly, a reasonable jury could find for Plaintiffs on the second <u>Davis</u> element—whether SGT was harassed based on his disability.

**ii. Third <u>Davis</u> Element: There are Genuine Factual Disputes Over Whether the Harassment was Sufficiently Severe or Pervasive that it Altered the Condition of SGT's Education and Created an Abusive Educational Environment.**

"In the context of student-on-student harassment, damages are only available where the behavior is so severe, pervasive, and objectively offensive that it denies its victims equal access to

education." Hawkins v. Sarasota Cnty. Sch. Bd., 322 F.3d 1279, 1288 (11th Cir. 2003) (citing Davis, 526 U.S. at 650). "The behavior must be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." Id. "Whether [the] conduct rises to the level of actionable harassment often depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and victim, and the number of individuals involved." Id. (citing Davis, 526 U.S. at 651; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 83 (1998)).

In Hawkins, the Eleventh Circuit explained that "simple acts of teasing and mere name-calling" do not constitute actionable peer-on-peer harassment while near-daily physical threats, excluding a student from participating in school activities, may rise to the level of harassment. Id. The crucial threshold is whether a plaintiff can "establish that the behavior so undermines and detracts from the victim's educational experience, that the student has effectively been denied access to an institution's resources and opportunities." Id. at 1289. This requires that the behavior have a "systemic" effect on the victim's education and "be more widespread than a single instance of one-on-one peer harassment." Id.

Paradigms of evidence demonstrating that harassment has become severe or pervasive include (1) declining grades, (2) writing a suicide note, (3) exhibiting self-destructive behavior, and (4) suffering from depression. Id. at 1289 n.13 (noting that the Eleventh Circuit does "not suggest that the consequences of harassment must always be as dire [as these four circumstances] in order to trigger liability." (citing Davis, 526 U.S. at 651; Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1243–44 (10th Cir. 1999); Vance v. Spencer Cnty. Pub. Sch. Dist., 231 F.3d 253 (6th Cir. 2000)). Conversely, missing a week or so of school does not amount to the effective denial of access to educational resources and opportunities. Id.

Here, the reports of bullying included SGT's classmates "throwing balls at the back of his head in gym class and students kicking him in the back of the knee in the hallway to try to make him fall down." Dkt. No. 146-3 ¶ 7. Further, in SGT's suicide note, he wrote, "in school, people call me 'gay boy' or 'faggot boy' and it really hurts me." Dkt. No. 146-7 at 137. According to Plaintiff, this harassment caused SGT's grades to drop, dkt nos. 146-6 at 5, 146-7 at 76:5–20, and his mental health to decline, dkt. no. 146-7 at 137. These are the "dire" consequences of harassment that the Hawkins court described to satisfy this element. 322 F.3d at 1289. Further, because the School's solution was to move SGT out of gym class, one could conclude he was effectively excluded from

16

participating in school activities. See id.; Dkt. No. 159 ¶ 71 ("Because the school was unable to address the claims of bullying with any known perpetrators, [Defendant] Burns spoke to school administration about moving SGT out of the gym class to separate him from the bullying."). Thus, a reasonable jury could find that the harassment was sufficiently severe, pervasive, and objectively offensive.

### iii. Fourth Davis Element: There are Genuine Factual Disputes Over Whether Defendants Knew about the Harassment.

To overcome summary judgment, an "appropriate person" employed by the School District "must have actual knowledge of the discrimination or harassment the plaintiff alleges occurred." Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1293 (11th Cir. 2007) (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998)). "An 'appropriate person'" is "at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination" or harassment. Gebser, 524 U.S. at 290. Defendants do not dispute that Assistant Principal Defendant Dugger or school counselor Defendant Burns were appropriate persons with the ability to take corrective action. Dkt. Nos. 146-2 at 16, 158 at 22; see generally Dkt. No. 167; see also Hill v. Cundiff, 797 F.3d 948, 971 (11th Cir. 2015) (holding that teacher's aides are "not high enough on the chain-of-command" to be appropriate persons but assistant principals or

similar personnel with "authority to discipline students" are appropriate persons).

It is undisputed that on October 28, 2019, Plaintiff Kohn contacted Defendant Burns to report that SGT was being bullied. Dkt. Nos. 146-1 ¶ 62, 159 ¶ 62. Defendants argue that the actual knowledge element is not satisfied because SGT, the recently fourteen-year-old middle schooler, did not identify the perpetrator of the bullying by name or the exact date or time of the bullying in the gym class. Dkt. Nos. 146-1 ¶¶ 69, 70, 146-2 at 17, 159 ¶¶ 69, 70. Courts, however, have not required such specificity where there is a direct complaint to an appropriate person that a student is being harassed. See Long, 2012 WL 2277836, at *29 (holding that the evidence was sufficient to create a material issue of fact as to whether appropriate persons had actual knowledge of the harassment where "unidentified" students harassed and mistreated the disabled student numerous times, and none of the reports were so explicit as to say the student was harassed "because of" his disability). While the "standard set out in Davis is not satisfied by knowledge that something *might* be happening and *could* be uncovered by further investigation[,]" this case is one with an undisputed report of harassment by Plaintiff Kohn to an appropriate person, Defendant Burns. See Doe v. Galster, 768 F.3d 611, 617–18 (7th Cir. 2014) (emphasis added). After this report, Plaintiff Kohn and Defendant Burns met on November 6, 2019,

18

to discuss the bullying and SGT's disability. Dkt. No. 159 ¶¶ 72, 82. Further, Defendant Burns swears he discussed "separat[ing] [SGT] from the bullying" with "school administration." Dkt. No. 146-3 ¶ 8. Thus, Plaintiff Kohn's discussions with Defendant Burns create a genuine issue for trial regarding the School District's actual knowledge of the harassment.

### iv.  Fifth Davis Element: There is a Genuine Issue Concerning Whether Defendants were Deliberately Indifferent to the Harassment.

"A school is deliberately indifferent only where its response, or lack thereof, to student-on-student harassment or discrimination is 'clearly unreasonable' in the light of known circumstances." Adams v. Demopolis City Schs., 80 F.4th 1259, 1270 (11th Cir. 2023) (quoting Davis, 526 U.S. at 648). "To act with deliberate indifference, a school district or official 'must know of and disregard an excessive—that is, an extremely great—risk to the victim's health or safety.'" Id. (quoting L.S. ex rel. Hernandez v. Peterson, 982 F.3d 1323, 1330 (11th Cir. 2020)).

"A school district is not deliberately indifferent simply because the measures it takes to stop the harassment or discrimination ultimately are ineffective." Id. (citing Sauls v. Pierce Cnty. Sch. Dist., 399 F.3d 1279, 1285 (11th Cir. 2005)). Importantly, in considering this element, the Court analyzes the school district's response to the student-on-student harassment, "not the alleged harasser['s]" conduct itself. Williams, 477 F.3d

at 1293 (quoting <u>Davis</u>, 526 U.S. at 640-41). The Court must "not hold a funding recipient liable solely because a person affiliated with the funding recipient discriminated against or harassed the plaintiff." <u>Id.</u> (citing <u>Hawkins</u>, 322 F.3d at 1284).

Plaintiffs allege that the School District was deliberately indifferent because (1) it failed to investigate the bullying claims and (2) it did not do anything to remedy the harassment. <u>See</u> Dkt. No. 158 at 24.

### a. Failure to Investigate

It is undisputed that the School District did not determine who the bullies were and did not do anything to discipline them. Dkt. No. 146-8 at 49:4 (Defendant Burns, SGT's guidance counselor, testified unequivocally, "I don't investigate."); Dkt. No. 146-12 at 19, 33:14-21 (Defendant Dugger testified, if "a report comes to [her] regarding bullying, [she] refer[s] it to the guidance counselor for investigation."). Despite Defendant Burns's clear testimony that he does not investigate, Defendants posit that the School District addressed the bullying because Defendant Burns interviewed SGT, but SGT did not "identify any individual" who threw the balls at him or kicked him, "nor could he identify any particular date or time in which it occurred." Dkt. No. 167 at 4. It is likewise undisputed that the School District did nothing to address or discipline the bullies outside of gym class, that is, the bullies who kicked SGT in the hallway. Dkt. No. 159 ¶ 62.

Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that the School District's inaction beyond speaking to the bullying victim—instead of investigation, discussion with SGT's gym teacher, or any other action in the face of the bullying—constitutes "an official decision not to remedy the harassment." Adams, 80 F.4th at 1271 (quoting Gebser, 524 U.S. at 290) (alterations adopted). Thus, a reasonable jury could find that this failure to investigate known student-on-student harassment was clearly unreasonable in light of SGT's prior suicide threat. See Adams, 80 F.4th at 1270.

### b. Failure to Move SGT Out of the Gym Class

Defendants respond that although the School District was "unable" to address the bullying directly, it was not deliberately indifferent because SGT was moved out of the gym class two to three weeks before his suicide. Dkt. Nos. 159 ¶¶ 71, 77. The record, however, presents a genuine question of material fact as to whether SGT was moved out of the gym class.

On one hand, Defendant Burns and the computer science teacher testified that the School District transferred SGT out of gym class to address the bullying. See generally Dkt. Nos. 146-3, 146-4, 146-14. Plaintiffs argue that Defendant Burns did not recall that

SGT was actually moved to the computer science class in his 2022 deposition.[8] Defendant Burns remembered, however:

> talking to [SGT] and his feeling of the bullying was that everybody in [gym] class was bullying, and . . . telling [an administrator] that I would like to get him out of that [gym] class into something else . . . [such as] the tech class, but that [memory] sticks out more than anything is *doing the technology out of [gym].*

Dkt. No. 146-8 at 13, 48:13-49:1 (emphasis added). While it is true that Defendant Burns did not testify unequivocally that the class transfer occurred, he did not contradict his later affidavit. Compare Dkt. No. 146-8 with Dkt. No. 146-3. Even so, the computer science teacher gave clear testimony that SGT was moved into his class. Dkt. Nos. 146-4 ¶ 2, 146-14 at 6, 15:19-21.

On the other hand, SGT's classmate testified that he "definitely" remembers seeing SGT in gym class in the two weeks before SGT's suicide, the classmate has specific memories from those dates, and he did not notice any gap when SGT was not in class. Dkt. No. 158-8 at 39:15-40:19, 45:12-47:7. Further, Plaintiff Kohn attests that SGT was not moved, she was not consulted about a class change for her son, nor did she receive

---

[8] In his later affidavit, Defendant Burns swore that "[SGT] was moved out of the gym class and into a Business and Computer Science class." Dkt. No. 146-3 ¶ 9.

any documentation related to a class change.[9] Dkt. Nos. 88-4 ¶ 25; 146-17 at 62:20.

Whether the School District addressed the harassment is a matter that must be resolved by a jury. This contradictory testimony presents genuine factual disputes over whether the class change occurred, and if not, what, if anything, the School District did to address the bullying. A reasonable jury could find that inaction, in the face of the prior suicide threats, was clearly unreasonable, thus amounting to deliberate indifference. Making these determinations will require credibility assessments, drawing inferences, and factfinding. This must be done by a jury. Therefore, the School District's motion for summary judgment is **DENIED** with regard to the ADA & RA disability-based harassment claim.

### C. RA Failure-to-Accommodate Claim Against School District

Next, Plaintiffs allege that SGT committed suicide, in part, because the School District failed to refer SGT to a 504 Plan and failed to inform SGT's parents of the possibility of a 504 Plan.

---

[9] Plaintiffs also argue "[n]o emails or written correspondence exist to prove that a change of class was requested or implemented . . .. Defendants deleted or lost all potential documentary evidence which could have proved whether a class change occurred." Dkt. No. 159 ¶ 75. While the Court notes the lack of record evidence documenting a class change, the Court declines to make an adverse inference in accordance with the Court's sanctions order. Dkt. No. 107 (granting motion for sanctions based on spoliation but noting such spoliation did "not rise to the level of drawing an adverse inference").

Dkt. No. 54 ¶ 82. This is a separate claim from the harassment claim. See Alboniga v. Sch. Bd. of Broward Cnty., 87 F. Supp. 3d 1319, 1337 (S.D. Fla. 2015) ("A plaintiff can assert a failure to accommodate as an independent basis for liability under the ADA and Section 504." (alterations adopted and citation omitted)).

As with the harassment claim, the RA requires a plaintiff to establish "(1) the plaintiff is an individual with a disability under the [RA]; (2) the plaintiff is otherwise qualified for participation in the program; (3) the plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his or her disability; and (4) the relevant program or activity is receiving federal financial assistance." Ms. H. v. Montgomery Cnty. Bd. of Educ., 784 F. Supp. 2d 1247, 1261 (M.D. Ala. 2011) (citing L.M.P. ex rel. E.P. v. Sch. Bd. of Broward Cnty., 516 F. Supp. 2d 1294, 1301 (S.D. Fla. 2007)); see also 29 U.S.C. § 794(a). "In certain circumstances, an educational institution's refusal to accommodate the needs of a disabled person amounts to discrimination against that person because of his disability." J.A.M. v. Nova Se. Univ., Inc., 646 F. App'x 921, 926 (11th Cir. 2016) (applying Section 504 in the postsecondary education context) (citing Se. Cmty. Coll. v. Davis, 442 U.S. 397, 412-13 (1979)); see also Tatro v. Texas, 625 F.2d 557, 564 (5th Cir. 1980) (recognizing a cause of action under Section 504 when a school

district has refused to provide reasonable accommodations to a disabled primary school student).[10]

Accordingly, several district courts in this Circuit have allowed a failure-to-accommodate claim for students.[11] Ms. H., 784 F. Supp. 2d at 1262 (requiring a showing of deliberate indifference); JSR v. Dale Cnty. Bd. of Educ., No. 1:13-CV-582, 2015 WL 5692804, at *10 (M.D. Ala. Sept. 28, 2015) (requiring a showing of deliberate indifference); W.C. v. Cobb Cnty. Sch. Dist., 407 F. Supp. 2d 1351, 1364 (N.D. Ga. 2005) (requiring a showing of "some bad faith or gross misjudgment by the school or that [the plaintiff] was discriminated against solely because of his disability"); Bryant v. Calvary Christian Sch. of Columbus Ga., Inc., No. 4:21-cv-205, 2023 WL 5018421, at *3 (M.D. Ga. Aug. 7,

---

[10] Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

[11] Plaintiffs argue that Defendants waived the opportunity to challenge the failure to accommodate claim on summary judgment by failing to address it in the initial motion. Dkt. No. 158-2 at 1. Plaintiffs, however, did not clearly state this theory of liability in the complaint by having a separate "failure to accommodate" cause of action. See Dkt. No. 54. Therefore, the Court declines to hold that Defendants waive the challenge by not arguing it in their opening brief on summary judgment. United States v. Kilgore, 151 F. App'x 799, 804 n.4 (11th Cir. 2005) ("When a party elaborates no arguments on the merits as to an issue in its initial or *reply brief*, the issue is deemed waived." (quoting Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (quotation marks omitted) (alteration adopted) (emphasis added)).

2023) (granting summary judgment before reaching the discrimination element).

"The Eleventh Circuit has not conclusively determined whether [these types of Section 504 cases] should be evaluated under the 'deliberate indifference standard' or a more stringent standard such as 'discriminatory animus.'" J.D.P. v. Cherokee Cnty., Ga. Sch. Dist., 735 F. Supp. 2d 1348, 1364 (N.D. Ga. 2010); see also Wood v. President & Trs. of Spring Hill Coll., 978 F.2d 1214, 1219 (11th Cir. 1992) ("As a general matter, good faith attempts to pursue legitimate ends are not sufficient to support an award of compensatory damages under section 504."). "[B]ecause the parties have argued this case under the deliberate indifference standard, the Court will analyze Plaintiffs' claims under that standard." J.D.P., 735 F. Supp. 2d at 1364. Unlike the application of the deliberate indifference standard to Plaintiffs' harassment claim, however, it cannot be said that the School District was deliberately indifferent by simply not placing SGT on a 504 Plan soon enough.

First, Plaintiffs' claim presupposes that SGT's ADHD diagnosis, without more, qualified him for a 504 Plan.[12] See Dkt.

_____

[12] Although Defendants "assume that [SGT] is an individual with a disability based on his ADHD diagnosis" for purposes of the disability harassment claim, Defendants do not concede that "SGT's ADHD diagnosis, standing alone, was sufficient to qualify him for a 504 Plan" for the failure-to-accommodate claim. Dkt. Nos. 146-2 at 14, 167 at 12.

No. 159 ¶ 10. The regulations implementing Section 504 in the context of educational institutions appear at 34 C.F.R. Part 104. These regulations provide that a qualifying disability, or handicap, is "a physical or mental impairment which substantially limits one or more major life activities." 34 C.F.R. § 104.3(j)(1) (A student also qualifies if he or she "has a record of such an impairment" or "is regarded as having such an impairment."). Further, "[a] recipient that operates a public elementary or secondary education program or activity shall conduct an evaluation . . . of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement." Id. § 104.35(a); see also Durbrow, 887 F.3d at 1186 (affirming the district court's holding that the student with ADHD was entitled to neither an Individuals with Disabilities Education Act ("IDEA") evaluation nor Section 504 services because he did not qualify as a "child with a disability"); Bryant, 2023 WL 5018421, at *5 (granting summary judgment for the school where the student with "ADHD and low-level autism" was not a "qualified individual" with a disability).

In this case, the record is devoid of evidence that SGT "need[ed] or [was] believed to need special education or related services" before Plaintiff Kohn requested a 504 Plan beyond the

ADHD diagnosis itself. See 34 C.F.R. § 104.35(a); Dkt. No. 146-9 at 7, 22:5-12 (Defendant Jackson describing why she did not refer SGT to 504 services because of his academic capabilities and her recognition that he "was a very bright child."). Even assuming SGT would have eventually received 504 services, Plaintiffs must still identify evidence to show that the School District's failure to evaluate SGT in light of SGT's need for 504 services rose to the level of deliberate indifference. See T.W., 610 F.3d at 604. The undisputed facts show that Plaintiff Kohn emailed the school in February 2018—advising SGT's teachers that SGT was beginning ADHD medication and requesting a meeting. Dkt. No. 146-7 at 98. According to Plaintiff Kohn's own testimony, at this point, she just wanted to "monitor" SGT's progress and the impact of ADHD on his academic performance. Id. at 7, 23:20-25. While it is true that the School District did not provide Plaintiff Kohn the Section 504 Request Form until November 2019, there is no evidence that it was deliberately indifferent in doing so. See Dkt. No. 146-7 at 116; Sellers v. Sch. Bd. of City of Manassas, 141 F.3d 524, 529 (4th Cir. 1998) (Where the School Board failed to evaluate the student for "many years," from the fourth grade until high school, the Fourth Circuit held that this presents "at best, a negligence claim—that the defendants should have recognized [plaintiff's] disability.").

Second, once Plaintiff Kohn requested a 504 Plan, the record evidence does not demonstrate deliberate indifference on the School District's part. Dkt. No. 146-7 at 116–19. Instead, it is undisputed that the 504 Request Form was completed four days before SGT took his own life. Id.; Dkt. No. 159 ¶ 86. Further, there are emails documenting internal discussions to determine SGT's eligibility during the period between when the School District gave Plaintiff Kohn the form and when she turned it in. Dkt. No. 146-11 at 49. Viewing the facts in the light most favorable to Plaintiffs and accepting that the School District "did not set any other meetings or communicate with Plaintiff Kohn" regarding the 504 Plan in those four days, the Court declines to hold that a delay of four days, including a weekend, constitutes deliberate indifference. Dkt. No. 159 ¶ 88. Importantly, a school does not violate the RA "merely because a court would have evaluated the child differently" or sooner. Monahan v. Nebraska, 687 F.2d 1164, 1170 (8th Cir. 1982); Ms. H, 784 F. Supp. 2d at 1263 (collecting cases holding that a school system's failure to timely evaluate does not state a § 504 claim). There are no facts to show a refusal of 504 services to SGT rooted in bad faith or gross misjudgment. See W.C., 407 F. Supp. 2d at 1364. Therefore, the undisputed facts demonstrate an absence of deliberate indifference, and the School District is entitled to summary judgment on Plaintiffs' failure-

to-accommodate claim. Defendants' motion is therefore **GRANTED** with regard to this claim.

## II.  EEOA Claim Against the School District

Plaintiffs allege that the School District, in fact, failed to monitor SGT for his ability to succeed in English language classes and failed to take appropriate action to overcome SGT's language barriers, thereby denying him an equal educational opportunity, in violation of the EEOA. Dkt. No. 54 ¶ 162. Plaintiffs do not respond to Defendants' arguments to grant summary judgment on this claim. Dkt. Nos. 158, 159; but see Dkt. No. 159 at 5–6 (Plaintiffs' response to Defendants' statement of material facts denied that SGT received the benefits of ESOL services.). "[W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." Jones v. Bank of Am., N.A., 564 F. App'x 432, 434 (11th Cir. 2014) (granting defendant's motion for summary judgment where plaintiffs failed to respond to arguments) (citation and quotation omitted).[13] Even so, the record does not support Plaintiffs' EEOA claim.

---

[13] Of note, at least one court in this Circuit has concluded that the EEOA does not confer a private right of action on parents. Warner v. Sch. Bd. of Hillsborough Cnty., No. 8:23-cv-181, 2024 U.S. Dist. LEXIS 35303, at *22 (M.D. Fla. Feb. 29, 2024). Thus, SGT's EEOA cause of action must survive his death for Plaintiffs to have standing. See Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 876 (11th Cir. 1986) (analyzing whether Title VII of the Civil Rights Act of 1964 survives under federal common law); Rondini v. Bunn, No. 7:17-cv-01114, 2018 U.S. Dist. LEXIS 2634, at *58 (N.D. Ala. Jan. 8, 2018) (analyzing the survivability of Title II of the

The EEOA prohibits a State from denying equal educational opportunities to individuals based on their national origin. 20 U.S.C. § 1703. Such a denial occurs when "an educational agency" fails "to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f). "An individual alleging a § 1703(f) violation must satisfy four elements: (1) defendant is an educational agency; (2) plaintiff faces language barriers that impede his equal participation in defendant's instructional programs; (3) defendant failed to take appropriate action to overcome those barriers; and (4) plaintiff was denied equal educational opportunity on account of his national origin." Methelus v. Collier Cnty. Sch. Bd., 243 F. Supp. 3d 1266, 1275 (M.D. Fla. 2017) (citation omitted).

Assuming that Plaintiffs' claim satisfies the first two elements, the Court analyzes whether the School District failed to take appropriate action to overcome SGT's language barriers. The former Fifth Circuit examined this third element in Castaneda v. Pickard, noting that "Congress has provided [courts] with almost no guidance, in the form of text or legislative history, to assist us in determining whether a school district's language remediation

ADA and Title IX); Moore, 936 F. Supp. 2d at 1303. Thus, the Court notes, without deciding, that the survivorship of Plaintiffs' EEOA claim is an open question. Nevertheless, Plaintiffs' EEOA claim fails on other grounds.

efforts are 'appropriate.'" 648 F.2d 989, 1009 (5th Cir. 1981). The circuit court then distilled the analysis of this element into a three-step inquiry: (1) whether the action is "informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy," (2) whether the defendant-school "made bona fide efforts to make the program work" with the "practices, resources and personnel necessary," and (3) whether the action, once implemented, "produce[s] results indicating that the language barriers confronting students are actually being overcome." Id. at 1009–10.

Plaintiffs assert that the School District failed to take appropriate action by prematurely transitioning SGT out of full ESOL services. Dkt No. 54-1 at 22–25. Further, Plaintiffs do not challenge the Georgia Department of Education's ESOL program generally, only how it was applied to SGT; thus, Plaintiffs do not assert that the Georgia state-wide ESOL program is uninformed, unsound, or illegitimate. See id. Therefore, the Court moves to the second two steps in the Castaneda inquiry. Here, the undisputed facts show that SGT received ESOL services upon his arrival to St. Mary's Middle School because he was Puerto-Rican and spoke Spanish as his first language. Dkt. Nos. 54-1 ¶ 144, 159 ¶¶ 5, 7. At the end of sixth grade, the School tested SGT for English language proficiency ("the ACCESS test"). Dkt. Nos. 146-5 at 7, 159 ¶ 14.

SGT's "Composite Proficiency Level score on that ACCESS test was 4.4 out of a maximum score of 6.0." Dkt. Nos. 146-5 ¶ 2, 159 ¶ 15. "Under Georgia's rules, ESOL students with a Composite Proficiency Level score on the ACCESS test between 4.3 to 4.9 may be moved out of a dedicated ESOL class and be a 'monitored student.'" Dkt. Nos. 146-5 ¶ 3, 159 ¶ 16. For his seventh and eighth grade years, SGT took a reading class with a designated ESOL teacher to provide in-school support and attended the teacher's after-school program twice per week if he needed extra assistance. Dkt. No. 146-11 at 4, 12:17-21. SGT developed a close relationship with the ESOL teacher, such that SGT confided in her when he was upset and "on rainy days [SGT's] Mom gave [the ESOL teacher] permission to give him and his brother a ride home." Id. at 4-5, 12:20-15:3. Plaintiffs do not dispute this ESOL teacher's testimony about her involvement in SGT's education.[14] Thus, the undisputed evidence shows that the School District "made bona fide efforts" to make the Georgia ESOL program work for SGT, devoting class time,

---

[14] Plaintiffs argue, more generally, that SGT did not receive the purported benefits of the "monitored student" program and that Defendants failed to preserve SGT's monitored student review forms. Dkt. No. 159 at 5-6. First, this argument is unsupported by the record. See, e.g., Dkt. No. 146-11 at 44 (ESOL Teacher's Deposition and Exhibits, including SGT's Monitored Student Conference Report). Second, the Court has previously held the loss of monitored student review forms did not warrant an adverse inference. Dkt. No. 107 ("An adverse inference remedy would be inappropriate" with regard to the ESOL records.).

resources, and personnel to SGT's remaining language barriers. Castaneda, 648 F.2d at 1010.

Lastly, Plaintiffs have not identified a scintilla of evidence connecting SGT's transition out of ESOL to his struggles at St. Mary's Middle School.[15] Methelus, for example, is illustrative. 243 F. Supp. 3d at 1276–77 (noting that Section 1703(f) of the EEOA "is a provision that the Supreme Court and Court of Appeals[,]" including the Eleventh Circuit, "have 'infrequently applied,'" and following the Third Circuit's decision in Issa v. School District of Lancaster, 847 F.3d 121 (3d Cir. 2017)). There, the defendant school district refused to enroll immigrant children in public school, declined to assess their English proficiency, referred those children to a paid, unaccredited adult education center, and otherwise failed to follow the district's procedures; this constituted a failure to take appropriate action to state an EEOA claim. Id. Here, Plaintiffs assert that SGT's grades suffered after being

---

[15] Initially, Plaintiffs asserted that SGT's classifying criterion of being Hispanic and speaking as his first language is connected to the bullying and harassment discussed supra, but they make no such argument in response to summary judgment. See Martin Luther King Junior Elementary Sch. Children v. Mich. Bd. of Educ., 463 F. Supp. 1027, 1031 (E.D. Mich. 1978) (requiring plaintiffs to "identify the connection between the defendants' failure to take appropriate action and a classifying criterion of race, color, sex, or national origin"); Dkt. No. 158.

transitioned out of ESOL. Dkt. No. 54 ¶¶ 158–59.[16] That is not enough to show that SGT was denied an equal educational opportunity on account of his national origin. See Methelus, 243 F. Supp. 3d at 1277. In sum, on this record, there is no genuine dispute regarding whether the School District made "a genuine and good faith effort, consistent with local circumstances and resources, to remedy the language deficiencies of [its] students." Castaneda, 648 F.2d at 1009. Defendants' motion is therefore **GRANTED** with regard to this claim.

### III. State Law Negligence Claims Against Defendants Burns, Dugger, and Jackson

Under Georgia law, "public employees may be subject to suit for negligent performance or nonperformance of their 'ministerial functions.'" Barnett v. Caldwell, 809 S.E.2d 813, 816 (Ga. 2018) (citing Ga. Const. art. I, § II, para. IX(d)). So, as public employees, "teachers may be held personally liable for negligence relating to their official duties only when performing 'ministerial' acts; 'discretionary' acts are only subject to suit when performed with actual malice or intent to cause injury." Id. "The Court thus first considers the nature of the alleged acts performed, and then, depending on the resolution of this first inquiry, the Court determines whether the allegations support

---

[16] The Court views the facts in the light most favorable to Plaintiffs and accepts that SGT's grades were "worse than As, Bs, and Cs" in the seventh grade. Dkt. No. 88-4 at 3.

negligence, if the acts are ministerial in nature, or actual malice, if the acts are discretionary." Williams v. Fulton Cnty. Sch. Dist., 181 F. Supp. 3d 1089, 1142 (N.D. Ga. 2016).

A ministerial act is defined as "commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." Barnett, 809 S.E.2d at 816 (citing Murphy v. Bajjani, 647 S.E.2d 54, 57 (Ga. 2007)). A discretionary act, on the other hand, "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Id. The "determination of whether the action at issue is discretionary or ministerial is made on a case-by-case basis, and the dispositive issue is the character of the specific actions complained of, not the general nature of the job." Id. (citing McDowell v. Smith, 678 S.E.2d 922, 925 (Ga. 2009)).

"Where there is an established policy requiring an official to take specified action in a specified situation, the policy creates a ministerial duty on the part of the official to perform the specified task." Roper v. Greenway, 751 S.E.2d 351, 353 n.2 (Ga. 2013). "Procedures or instructions adequate to cause an act to become merely ministerial must be so clear, definite and certain as merely to require the execution of a relatively simple, specific duty." Id. at 353 (quoting Effingham Cnty. v. Rhodes, 705 S.E.2d

36

856, 859 (Ga. Ct. App. 2010)). Put simply, the question is not merely whether the school officials owed SGT a duty of care, "but rather, whether the official owed a duty that is particularized and certain enough to render her duty a ministerial one." Eshleman v. Key, 774 S.E.2d 96, 100 (Ga. 2015). If no ministerial duty is owed, Defendants are entitled to official immunity unless Plaintiffs show actual malice or intent to cause injury. Barnett, 809 S.E.2d at 816.

Plaintiffs allege that Defendants Burns, Dugger, and Jackson should be held liable for the negligent performance of their ministerial duties. Dkt. Nos. 54, 158 at 10. The Court addresses each Defendant's duty in turn.

### A. Defendant Dugger

Plaintiffs allege that Defendant Dugger breached her ministerial duty to investigate the reports of bullying. The Court holds that the duty to investigate bullying involves discretionary acts, not ministerial ones. Plaintiffs cite to a harassment and bullying flowchart used by the School District to show that the investigation into bullying does not involve the exercise of discretionary judgment. Dkt. No. 158-3. However, this document, "How to Determine Whether An Incident May Be Considered Bullying Or/And Harassment," shows how this determination requires extensive deliberation and judgment. Id. This determination instructs the administrator to ask whether the potentially

harassing conduct substantially interfered with the student's education, creates an intimidating or threatening environment, or substantially disrupts the orderly operation of the school. Id. The administrator must also ask whether the conduct was related to the student's race, color, national origin, sex, or disability. Id. These are complex questions that factor into the decision to investigate. The threshold question of whether an incident rises to the level of bullying undoubtedly "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Barnett, 809 S.E.2d at 816 (citing Murphy, 647 S.E.2d at 54).

Plaintiffs rely on a Georgia Court of Appeals case, Wanless v. Tatum, 536 S.E.2d 308 (Ga. Ct. App. 2000), to argue that the decision to investigate, or not, is a ministerial act. Dkt. No. 158 at 14. In Wanless, the Georgia Court of Appeals held that the county employee, who took citizen complaint calls, wrote those complaints down, and forwarded those complaints to the appropriate section for investigation, performed a ministerial task. 536 S.E.2d at 883. Here, Defendant Dugger's task was much more involved than recording complaints of bullying and passing them along. Rather, Defendant Dugger's duty involves analyzing each incident and reasoning to decide whether it was serious bullying or innocent schoolyard jest. See Dkt. No. 158-3. It cannot be said that this

38

preliminary task to decide whether to open a harassment investigation is "simple" or "absolute." Barnett, 809 S.E.2d at 816.[17]

Instead, this case is analogous to other public school cases in which "Georgia courts routinely hold that a teacher's or administrator's actions are discretionary if, at their core, the actions involve supervising students or staff, even if there is a mandatory dimension to the defendant's actions." Williams, 181 F. Supp. 3d at 1143 (holding that the failure to report student abuse involves discretionary acts); D.D.T. v. Rockdale Cnty. Pub. Sch., 580 F. Supp. 3d 1314, 1348 (N.D. Ga. 2021) (holding that the failure to fulfill mandatory reporting obligations is discretionary); Doe v. Liberty Cnty. Sch. Dist., No. 4:20-cv-53, 2022 WL 1402057, at *7 (S.D. Ga. Mar. 23, 2022) (holding that the failure to report sexual assault was a discretionary act); Payne

---

[17] Plaintiffs' reliance on "failure to inspect" cases is also unavailing. See Dkt. No. 158 at 14. For example, in Georgia Department of Transportation v. Heller, the policy required that the state employee "must" receive proof of a prior inspection before inspecting a vehicle. 674 S.E.2d 914, 919 (Ga. 2009). "Despite the company's failure to provide this required proof," the employee conducted the investigation. Id. In this case, the school's policy did not require action unless and until Defendant Dugger, or another administrator, made the determination that the conduct was bullying or harassment. Dkt. No. 89-6 at 2 (policy requiring the administrator to "appropriately investigate[] . . . based upon the nature of the complaint in a timely manner to determine whether bullying has occurred"). Thus, this case is one where Defendant Dugger "was required to exercise discretion" based on the policy. Barnett, 809 S.E.2d at 818.

v. Twiggs Cnty. Sch. Dist., 501 S.E.2d 550, 552 (Ga. Ct. App. 1998) (holding that the failure to act upon a report of a weapon at school is discretionary because it requires the school officials "to assess the credibility of [the] allegations and make a judgment call as to whether those allegations merited immediate investigation"). Thus, Defendant Dugger performed a discretionary duty when she investigated, or failed to investigate, the reports of bullying against SGT. Because Plaintiffs make no showing that Defendant Dugger acted with malice or intent to injure, she is entitled to official immunity.

**B. Defendant Burns**

With regard to Defendant Burns, Plaintiffs first allege he breached a ministerial duty by failing to report and notify SGT's parents of a threat of self-harm. Dkt. No. 158 at 17. Second, Plaintiffs allege that he breached a ministerial duty to inform SGT's teachers of SGT's risk of suicide and self-harm. Id. at 19. The Court holds that the handling of a student's suicide or self-harm threat is a discretionary task.

Plaintiffs provide the School District's "Procedural Guidelines for Suicidal Threat." Dkt. No. 158-6 at 1. These procedures provide that the school counselor, here, Defendant Burns, "will do a risk of threat assessment" after being made aware of a student's suicidal threat. Id. at 3. Plaintiffs correctly assert that a positive response to any of the suicide screening

40

questions requires parent notification per the policy. Id. at 3-7. The procedures do not require the counselor to inform the student's teachers or trusted adult. See id. Again, this policy gives discretion to the school counselor before the task of parent notification. First, before the assessment, there must be a suicide threat which could be "any spoken, written, or behavioral indication of self-destructive tendencies with the intent of self-harm or taking one's own life." Id. Determining whether a middle school student's statement is indicative of self-destructive tendencies is not "simple, absolute, and definite, . . . requiring merely the execution of a specific duty." Barnett, 809 S.E.2d at 816. Second, the policy does not provide a specified action if the student answers negatively, or ambiguously, to the initial questions. Suppose, for instance, if a student told the counselor that he or she was joking when she made the concerning statement. Or, here, where SGT refused to answer certain questions. See Dkt. No. 159 ¶ 34. This assessment requires the counselor to examine the facts of each case, reach a reasoned conclusion about the student's suicide threat, and act in accordance with that assessment. See Barnett, 809 S.E.2d at 816.

Accordingly, courts have held that mandatory reporting in schools involves discretionary acts because the facts surrounding the incidents are typically complex and delicate, rather than simple and absolute. Williams, 181 F. Supp. 3d at 1143; D.D.T.,

41

580 F. Supp. 3d at 1347 ("Just because an action is 'statutorily-mandated' does not mean it is 'the equivalent of a ministerial act that deprives the actor of official immunity if done negligently.'"). Here, the procedural guidelines require the school counselor to assess each child individually, interpret his potentially suicidal statement or gesture, and evaluate his answers to questions before reaching the required parental notification. Thus, these procedures are not "so clear, definite and certain as merely to require the execution of a relatively simple, specific duty." Roper, 751 S.E.2d at 353. Thus, Defendant Burns performed a discretionary act when he responded to the teacher's concerns for SGT.

Because Plaintiffs make no attempt to show that Defendant Burns acted with malice or intent to injure, he is entitled to official immunity.

**C. Defendant Jackson**

Plaintiffs' negligence claim against Defendant Jackson centers on whether she inappropriately disciplined SGT on the day of his suicide. Dkt. No. 54-1 ¶¶ 179–80. Plaintiffs do not respond to Defendants' arguments on summary judgment regarding Defendant Jackson.[18] See Dkt. No. 158. "If a party fails to adequately brief

---

[18] Plaintiffs argue "Defendant Dugger, Defendant Burns, and the District are liable to Plaintiffs under their breaches of ministerial duties" but do not mention Defendant Jackson. Dkt. No. 158 at 10.

a claim in responding to a motion for summary judgment, [the Court] will consider that claim to have been abandoned." Ajomale v. Quicken Loans, Inc., 860 F. App'x 670, 671 (11th Cir. 2021); see also Resolution Trust Corp., 43 F.3d at 599 ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").[19]

Therefore, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiffs' state law negligence claims. Accordingly, no claims remain pending against Defendants Burns, Dugger, or Jackson.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment, dkt. no. 146, is **GRANTED in part** and **DENIED in part.**

The motion is **GRANTED** as to:

- Plaintiffs' disability-based harassment claim under the ADA and RA against Defendants Burns, Dugger, and Jackson (Count A);

- Plaintiffs' failure-to-accommodate claim under the ADA and RA against all Defendants (Count B);

- Plaintiffs' Title VI and EEOA claim against the School

---

[19] Even so, student discipline calls for the school official's exercise of personal deliberation and judgment. E.g., Payne, 501 S.E.2d at 552.

District (Count C);

- Plaintiffs' negligence claim against Defendant Dugger (Count D);

- Plaintiffs' negligence claim against Defendant Burns (Count E);

- Plaintiffs' negligence claim against Defendant Jackson (Count F).

These claims are therefore **DISMISSED with prejudice.** The Clerk is **DIRECTED** to terminate Burns, Dugger, and Jackson as defendants in this action.

Defendants' motion for summary judgment is **DENIED** as to:

- Plaintiffs' disability-based harassment claim under the ADA and RA against the School District (Count A).

The Parties are **ORDERED** to file a proposed consolidated pretrial order on or before February 24, 2025. A pretrial conference will be held on Wednesday, February 26, 2025, at 4:30 p.m., and a jury trial will be held on Tuesday, March 4, 2025, at nine o'clock a.m. at the federal courthouse in Brunswick, Georgia.

**SO ORDERED** this 14th day of February, 2025.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA